# EXHIBIT A



**Mandell Menkes** LLC

One North Franklin St., Suite 3600 Chicago, IL 60606
Office 312.251.1000 | mandellmenkes.com

**Brendan J. Healey**

E-mail: bhealey@mandellmenkes.com
Writer's Direct Dial: 312.251.1006

June 27, 2019

<u>**VIA ELECTRONIC MAIL**</u>

Gregory E. Kulis
Gregory E. Kulis and Associates, Ltd.
30 North LaSalle Street, Suite 2140
Chicago, IL 60602-3368
gkulis@kulislawltd.com

> Re: *Osundairo v. Geragos*, 19-cv-2727 (N.D. Ill.) Rule 11 Letter

Dear Mr. Kulis:

Enclosed are Defendants' Motion for Sanctions under Federal Rule of Civil Procedure 11 and their Memorandum in Support of the Motion. Defendants intend to seek sanctions against your clients and their counsel of record based on frivolous and false allegations in the Complaint, as described in the attached motion.

By this letter, Defendants requests that you voluntarily dismiss the sanctionable portions of the Complaint by no later than July 18, 2019. If you refuse to do so, Defendants intend to file the attached motion.

Sincerely,

Brendan J. Healey

Cc:     Via email with attachments
        James D. Tunick (jamestunick@gmail.com)
        Gloria V. Schmidt (gloria@gloriaslaw.com)
        Brian M. Orozco (borozco@kulislawltd.com)
        Jorge A. Rodriguez (lawoffice.jarodriguez@gmail.com)
        Monica Ghosh (mghosh@kulislawltd.com)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| OLABINJO OSUNDAIRO and ABIMBOLA OSUNDAIRO, Individually, | |
| Plaintiffs, | Case No. 19-cv-2727 |
| v. | Honorable Matthew F. Kennelly |
| MARK GERAGOS, TINA GLANDIAN, and GERAGOS & GERAGOS LAW FIRM, | |
| Defendants. | |

## <u>MOTION FOR SANCTIONS UNDER RULE 11</u>

Defendants Mark Geragos, Tina Glandian, and the Geragos & Geragos Law Firm (collectively, "Defendants") hereby move for sanctions against plaintiffs Olabinjo Osundairo and Abimbola Osundairo (collectively, "Plaintiffs") pursuant to Fed. R. Civ. P. 11. In support of their motion, Defendants state as follows.

1.      Early in the morning of January 29, 2019, Plaintiffs attacked Jussie Smollett on the streets of Chicago. The Plaintiffs received a great deal of public attention in connection with their role in the attack.

2.      Defendants are Mr. Smollett's lawyers. Plaintiffs contend that Defendants defamed them in connection with statements Defendants made in the course of their representation of Mr. Smollett. Plaintiffs also bring claims for false light and *respondeat superior*.

3.      Plaintiffs do not specifically allege any actionable defamatory statements uttered by Defendants. They do however falsely attribute to Ms. Glandian an allegedly defamatory

statement regarding Plaintiffs' bodybuilding techniques that was actually made by their own lawyer, Gloria Schmidt, to the *Chicago Tribune*. This is the single quote of any substance they include in their Complaint, and they pinned it on the wrong person. This false factual allegation alone is sanctionable.

4.  In addition, Plaintiffs do not identify *any* statements Mr. Geragos allegedly made. Instead, they include false characterizations of his statements that are likewise sanctionable.

5.  Moreover, Plaintiffs' claim for *respondeat superior* is not warranted by existing law. *Respondeat superior* is a theory of liability, not a basis for an independent claim.

6.  On June 27, 2019, Defendants sent Plaintiffs a letter pursuant to Rule 11 with a draft motion stating the elements of Plaintiffs' Complaint that were not supported by facts or law.

7.  In response, Plaintiffs refused to withdraw their Complaint and the sanctionable portions thereof, forcing Defendants to bring this motion.

WHEREFORE, Defendants Mark Geragos, Tina Glandian, and the Geragos & Geragos Law Firm respectfully request that this Court grant their motion and sanction Plaintiffs and their counsel of record by dismissing with prejudice any elements of the Complaint based on the misattributed quotation, dismissing with prejudice any claims based on statements by Mr. Geragos, dismissing with prejudice the *respondeat superior* claim, and granting Defendants their reasonable fees and costs incurred in bringing this motion.

Dated: July __, 2019

Respectfully submitted,

MARK GERAGOS, TINA GLANDIAN,
AND GERAGOS & GERAGOS LAW FIRM

By: ___/s/ Brendan J. Healey_____
    One of their attorneys

Brendan J. Healey (ARDC #6243091)
Natalie A. Harris (ARDC #6272361)
MANDELL MENKES LLC
1 North Franklin Street, Suite 3600
Chicago, IL 60606
(312) 251-1000
bhealey@mandellmenkes.com

*Counsel for Defendants Mark Geragos,*
*Tina Glandian, and Geragos & Geragos Law Firm*

OLABINJO OSUNDAIRO and ABIMBOLA
OSUNDAIRO, Individually,

      Plaintiffs,

v.

MARK GERAGOS, TINA GLANDIAN, and
GERAGOS & GERAGOS LAW FIRM,

      Defendants.

Case No. 19-cv-2727

Honorable Matthew F. Kennelly

## MEMORANDUM IN SUPPORT OF THE DEFENDANTS'
## MOTION FOR SANCTIONS UNDER RULE 11

### INTRODUCTION

Plaintiffs have blatantly violated Fed. R. Civ. P. 11 by falsely asserting the source of an

allegedly defamatory statement, by grossly mischaracterizing a defendant's statements, and by

pursuing a claim for *respondeat superior* that is not warranted by existing law. Plaintiffs

attributed the statement about Plaintiffs' bodybuilding techniques to Jussie Smollett's lawyer,

Tina Glandian, knowing that it was their own lawyer, Gloria Schmidt, who uttered it to the

media.[1] Also, in their zeal to drag a well-known lawyer into the case, Plaintiffs mischaracterized

Mark Geragos' statements, and their allegations against him are unfounded in fact. Finally, in an

effort to dig into the pockets of Ms. Glandian's law firm with their frivolous lawsuit, Plaintiffs

filed an improper separate claim for *respondeat superior*. Unfortunately for Plaintiffs, the Illinois

Supreme Court and this Court have determined that *respondeat superior* is not a separate cause

of action. Defendants seek an order dismissing Plaintiffs' baseless claims with prejudice and

---

[1] Ms. Schmidt represents Plaintiffs in this matter.

requiring Plaintiffs and their counsel to pay Defendants' reasonable attorney's fees and costs incurred in bringing this motion.

## BACKGROUND

Plaintiffs are brothers Olabinjo and Abimbola Osundairo. (Compl. Dkt. 1.) In the early morning of January 29, 2019, they attacked the actor Jussie Smollett. (*Id*. ¶¶ 10, 16-17.) The incident and its aftermath generated a great deal of publicity. (*Id*. ¶ 22.) The Osundairo brothers catapulted to world-wide fame.

On April 23, 2019, the brothers sued Mr. Smollett's attorneys Tina Glandian, Mark Geragos, and the Geragos & Geragos Law Firm. (Compl.) Plaintiffs brought two counts of defamation (one each against Ms. Glandian and Mr. Geragos), two counts of false light (one each against Ms. Glandian and Mr. Geragos), and one claim for *respondeat superior* (against the Geragos & Geragos Law Firm). (*Id*.) Plaintiffs sued based on statements (allegedly) made in the course of Defendants' representation of Mr. Smollett.

In their Complaint, however, Plaintiffs failed to identify properly Ms. Glandian and Mr. Geragos' allegedly defamatory statements. Instead, Plaintiffs wrongly summarized the Defendants' purported statements or falsely stated what Defendants supposedly implied or inferred. (*Id*. ¶¶ 27, 31, 32, 59, 83, 84.) The Complaint does not contain *any* allegedly defamatory statements by Mr. Geragos. With regard to Ms. Glandian, Plaintiffs quote only three allegedly defamatory statements that Ms. Glandian purportedly made. According to Plaintiffs, Ms. Glandian used the word "whiteface" (*id*. ¶ 27) and the word "illegal" (*id*. ¶ 46), and she stated that Plaintiffs' "platform . . . is all about being steroid-free . . . Their whole thing is, you know, all-natural bodybuilding. It's ridiculous." (the "Ridiculous Statement") (*id*. ¶ 47). Ms. Glandian did not make the Ridiculous Statement, though, and Plaintiffs' allegation is

demonstrably false. It was Plaintiffs' own lawyer, Gloria Schmidt, who made the Ridiculous

Statement, and she did so to the *Chicago Tribune*. As the comparison below shows, the

Ridiculous Statement is taken word-for-word from Ms. Schmidt's statement to the *Chicago*

*Tribune*:

| Statement in April 8, 2019 *Chicago Tribune* | Statement in April 23, 2019 Complaint |
|---|---|
| When told of the defense's claim about the meaning of the 'on the low' text, [Gloria] Schmidt laughed, saying that providing steroids to a client goes against their "code." "Their *platform* – the brothers' – *is all about being steroid-free*," she said. "*Their whole thing is, you know, all-natural bodybuilding. It's ridiculous*." (emphasis added) (article attached as Ex. A, excerpted statement highlighted) | 46. Ms. Glandian falsely stated that Plaintiffs are involved in "illegal" Nigerian steroid trafficking, and that these steroids help clients lose weight. 47 Ms. Glandian added, scoffing, that Plaintiffs' "*platform . . . is all about being steroid-free . . . Their whole thing is, you know, all-natural bodybuilding. It's ridiculous*." (emphasis added) |

Plaintiffs allege that Mr. Geragos made defamatory statements only on *Reasonable*

*Doubt,* a weekly podcast he co-hosts with comedian Adam Carolla (Compl. ¶ 82), but Plaintiffs

do not quote any statements allegedly made by Mr. Geragos. Instead, they purport to paraphrase

his statements. According to Plaintiffs, "Mr. Geragos falsely stated that he could not think of

anyone else who committed the hate crime against his client, Mr. Smollett, besides Plaintiffs."

(*Id*. ¶ 83.) Plaintiffs also allege that "Mr. Geragos repeatedly indicated that Plaintiffs conspired

to criminally attack Mr. Smollett, and by doing so, implied Plaintiffs committed perjury before

the February 20, 2019 grand jury and conspired to make false statements to Chicago Police." (*Id.* ¶ 83.) Defendants had a court reporter prepare a transcript of the podcast, a copy of which (with Mr. Geragos' statements highlighted) is attached as Ex. B. Not only did Mr. Geragos never make the statements Plaintiffs attribute to him, but also it is clear from the transcript that Mr. Geragos never even said the name "Osundairo" or the word "brother" during the podcast.

## ARGUMENT

### I. Plaintiffs and their counsel are subject to Rule 11 sanctions for alleging a false statement and unsupported claim against Defendants.

Rule 11 prohibits attorneys and parties from making false or unsupportable representations to the court and imposes an affirmative duty on attorneys to conduct a reasonable investigation before signing a court document. *See Capuano v. Consol. Graphics, Inc.*, 2007 U.S. Dist. LEXIS 52664, at *5 (N.D. Ill. July 20, 2007). Rule 11 provides that, when an attorney presents a pleading to the court, that attorney is making a certification "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b). Specifically, Rule 11 mandates that 1) affirmative pleadings must be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law"; and 2) "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." *Id.*

If the court determines that Rule 11 has been violated, it "may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). When "a court finds that a lawyer violated Rule 11, it 'enjoys broad discretion in setting a sanction award that it will serve the deterrent purpose of

Rule 11.'" *Jackson v. Experian Info. Sols., Inc.*, 2017 U.S. Dist. LEXIS 92347, *4 (N.D. Ill. June 6, 2017) (*quoting Divane v. Krull Elec. Co.*, 319 F.3d 307, 314 (7th Cir. 2003)). This sanction is often an award of fees that directly resulted from the sanctionable conduct. *See Jackson*, 2017 U.S. Dist. LEXIS 92347, *4 (N.D. Ill. June 6, 2017) (*quoting Divane*, 319 F.3d at 314). *See also Capuano*, 2007 U.S. Dist. LEXIS 52664, at *15 (ordering payment of defendants' reasonable attorneys' fees and costs in defending two causes of action); *Espinoza v. Northwestern Univ.*, 2004 U.S. Dist. LEXIS 1203, at *11 (N.D. Ill. Jan. 30, 2004) (ordering $5,000 payment to defendant); *Retired Chicago Police Assn. v. City of Chicago*, 1994 U.S. Dist. LEXIS 11732, *4 (N.D. Ill. Aug. 22, 1994) (noting payment of more than $70,000 in sanctions to defendants). Here, Plaintiffs and their counsel's actions merit not only dismissal of the sanctionable claims but also a payment of fees.

## II.     Plaintiffs and their counsel knew Ms. Glandian did not make the Ridiculous Statement but falsely alleged in their Complaint that she did.

As demonstrated above, Plaintiffs falsely attribute Ms. Schmidt's statement to Ms. Glandian. Incredibly, Plaintiffs also claim the Ridiculous Statement, which their own attorney in fact made, was defamatory.

Indeed, Plaintiffs' defamation claims are largely a mix of implication and inference with few direct quotations of actual statements made by Defendants. This, by itself, is a basis for dismissal of the claims. And in the one instance where Plaintiffs actually include a quote of any substance, it is wholly false and misleading. In this regard, this matter is similar to the *Portman* case in which this Court granted a Rule 11 motion because plaintiff's claim was "premised on phony documents." *Portman v. Andrews*, 249 F.R.D. 279, 281 (N.D. Ill. 2007) (emphasizing that

documents were "patently phony"). Similarly here, the attribution of the Ridiculous Statement is patently phony.

When a court determines whether to levy sanctions for false statements of fact, "[t]he inquiry is an objective one: whether the party should have known his position was groundless." *Id.* Here, Plaintiffs cannot plausibly claim to have been unaware of the facts relating to their own lawyer's quotation, particularly since Ms. Schmidt represents Plaintiffs in this very action. Thus, any reasonable person would have known that Plaintiffs' defamation claim against Ms. Glandian based on the Ridiculous Statement was entirely baseless and lacking in evidentiary support. Because one of the significant underpinnings of Plaintiffs' allegations is irredeemably flawed, any claim based on the Ridiculous Statement should be dismissed with prejudice.

### III. Plaintiffs falsely implicated Mr. Geragos in a sanctionable attempt to land a big-name defendant.

Mr. Geragos is a very well-known, high-profile criminal defense attorney, but Plaintiffs crossed the line when they tried to use his alleged statements to rope him into this case without any legal or factual basis. First, the Plaintiffs do not quote a single statement Mr. Geragos made. That, in itself, is a problem. Even though courts in the Northern District of Illinois do not require a letter-perfect rendition of the allegedly defamatory statements, they do impose a higher standard of pleading on defamation plaintiffs. *See Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*, 161 F. Supp. 2d 876, 882 (N.D. Ill. 2001) (acknowledging "that some specificity for defamation claims is required" and noting that "the specificity requirement pertains to the content of the defamatory remarks."). The purpose of this requirement is to provide defamation defendants "with general knowledge of the exact language alleged, to allow

them to form a responsive pleading." *Wynne v. Stevenson*, 2002 U.S. Dist. LEXIS 24043, at *5 (N.D. Ill. Dec. 13, 2002).

A review of the *Reasonable Doubt* podcast transcript shows that Plaintiffs did not quote Mr. Geragos because he did not say what they claim he said. This is not a close call or a matter of interpretation. Mr. Geragos did not make the statements Plaintiffs allege he made. Plaintiffs and their counsel grossly misrepresented Mr. Geragos' statements. Because there is no factual support for these allegations in the Complaint, Plaintiffs and their counsel's actions are sanctionable.

IV.    **Rule 11 sanctions are appropriate because Plaintiffs' *respondeat superior* claim has no reasonable basis in law.**

Plaintiffs brought a claim for *respondeat superior* (Count V), but *respondeat superior* is a theory of liability, not the basis for an independent cause of action. The Illinois Supreme Court therefore has expressly held that "actual agency and apparent agency are not causes of action." *Wilson v. Edward Hosp.*, 2012 IL 112898, 981 N.E. 2d 980 (2012). *See also Jones v. UPS Ground Freight, Inc.*, 2016 U.S. Dist. LEXIS 26865, *9 (N.D. Ill. Mar. 3, 2016) (holding that, under Illinois law, "*respondeat superior* is not by itself a separate cause of action"). Plaintiffs' claim for *respondeat superior* is based neither on existing law nor on a nonfrivolous argument for extending existing law or establishing new law. Accordingly, the *respondeat superior* claim is sanctionable and must be dismissed.

## CONCLUSION

For the reasons set forth herein and in the accompanying Motion, the Defendants respectfully request that this Court grant their motion and sanction Plaintiffs and their counsel of record by dismissing with prejudice any elements of the Complaint based on the Ridiculous

Statement, dismissing with prejudice any elements of the Complaint based on Mr. Geragos'

alleged statements, dismissing with prejudice Count V of Plaintiffs' Complaint, and granting

Defendants their reasonable fees and costs incurred in bringing this motion.

Dated: July __, 2019               Respectfully submitted,

                                     MARK GERAGOS, TINA GLANDIAN,
AND GERAGOS & GERAGOS LAW FIRM

                                     By: ___/s/ Brendan J. Healey_____
                                              One of their attorneys

Brendan J. Healey (ARDC #6243091)
Natalie A. Harris (ARDC #6272361)
MANDELL MENKES LLC
1 North Franklin Street, Suite 3600
Chicago, IL 60606
(312) 251-1000
bhealey@mandellmenkes.com

*Counsel for Defendants Mark Geragos,*
*Tina Glandian, and Geragos & Geragos Law Firm*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing document has been served on July ___, 2019 via the Court's CM/ECF system on all counsel of record who have consented to electronic service.


/s/ Brendan J. Healey

# EXHIBIT A

# Mystery remains over why Kim Foxx's office dismissed hoax charges against Jussie Smollett



A grand jury indicted Jussie Smollett on 16 counts of disorderly conduct in February. Cook County prosecutors on March 26, 2019, dropped all charges against Smollett on disorderly conduct charges. The 36-year-old actor vehemently denied lying to police and faking a homophobic attack in the Streeterville neighborhood on Jan. 29, 2019. (Chicago Tribune)

By **Jason Meisner and Megan Crepeau**
Chicago Tribune

APRIL 8, 2019, 5:38 AM

**M**oments after "Empire" actor Jussie Smollett pleaded not guilty to bombshell charges of staging a hate crime on himself, Cook County prosecutors were already looking to cut a deal, the actor's attorneys say.

After the brief March 14 arraignment, as reporters and spectators filed out of the courtroom, Smollett's attorneys say the assistant state's attorney handling the hot-button case asked them: What can we do to help this case go away?

That signal sparked a week and a half of behind-the-scenes negotiations, ending with the stunning decision by State's Attorney Kim Foxx's office to drop all 16 counts of disorderly conduct against Smollett — a move that sparked outrage and calls for Foxx to resign.

With the fallout from the Smollett case continuing unabated, the Chicago Tribune attempted to piece together what led to such an abrupt dismissal of a case that had garnered international interest.

Foxx's office has denied multiple requests by the Tribune to interview the lead prosecutor, who made the decision to drop the charges, or Foxx's top deputy, who signed off on the deal. The central question — why prosecutors made the about-face — largely remains a mystery.

Meanwhile, Foxx, who had informally "recused" herself from the case due to a conflict, has faced mounting pressure to explain in more detail why the prosecution of Smollett was so quickly abandoned. In an op-ed in the Tribune, she backed off her office's initial stance that the case was strong, writing that they were uncertain of a conviction, but she offered no specifics.

At a news conference Saturday, Foxx declined to talk about "the substance of the case," saying the matter is "continuing to be reviewed by others" — but she did not say by whom.

But for the first time, Smollett's attorneys have provided their account of how the case concluded, saying in interviews with the Tribune that they'd rejected early offers of a deferred prosecution and insisted instead on a full dismissal. The defense team — which includes Los Angeles-based celebrity attorney Mark Geragos — blasted the case as weak while acknowledging they had been given only a sliver of the evidence gathered by Chicago police.

Smollett's lawyers said they emphasized in talks with Foxx's subordinates that the case hinged on questionable testimony by two brothers who told police that Smollett had paid them to stage the Jan. 29 attack. They also hammered on public statements made by police Superintendent Eddie Johnson that they believed were inconsistent with evidence that prosecutors later presented in court.

On Friday, though, Johnson told the Tribune he did "nothing unusual" in holding a news conference to detail a high-profile investigation, defending everything he said as based on evidence he still considers rock-solid.

"There was nothing that I personally interjected into my comments," Johnson said.

With the reason behind the dismissal still a mystery, the controversy has continued to rage. This week, the Chicago Fraternal Order of Police staged a protest outside Foxx's Loop offices calling on her to resign, and a suburban police chief association issued a "no confidence" letter attacking her lenient

approach to prosecuting low-level crimes. Mayor-elect Lori Lightfoot also weighed in, saying Foxx owed Chicago a more "fulsome" explanation of her office's actions.

On the legal front, two separate petitions — one from a former prosecutor in Foxx's office and another from a retired Illinois appellate judge — were filed this week calling for a special prosecutor to investigate how the Smollett case was handled and whether the actor could be re-charged.

Patricia Brown Holmes, Smollett's lead Chicago attorney, told the Tribune in an interview last week that as the point person handling the negotiations, she tried to make it clear to Foxx's office that it would be embarrassed if prosecutors took the case to trial and lost.

"What I walked them through was the legality (of the investigation)," Holmes said at her downtown law office. "Whether they believe he's guilty or not, your case is crap. You can't sustain your burden (of) proof beyond a reasonable doubt."

## 'How is that going to make your case look?'

The swift dumping of Smollett's case seemed at stark odds with the details laid out at the actor's bond hearing just a few weeks earlier. Prosecutors at the Feb. 21 hearing said they had a litany of evidence to prove Smollett orchestrated an attack on himself that frigid night in the Streeterville neighborhood.

Smollett, who is African-American and openly gay, claimed he was walking from a Subway sandwich shop to his apartment in the 300 block of East North Water Street about 2 a.m. Jan. 29 when two men walked up, yelled racial and homophobic slurs, hit him and wrapped a rope around his neck. He said they also yelled, "This is MAGA country."

Police initially treated the incident as a hate crime. But their focus turned to Smollett after the brothers, who were arrested at O'Hare International Airport after returning from a scheduled trip to Nigeria, began cooperating with police.

At Smollett's bond hearing, prosecutors detailed a seemingly airtight case that included phone records, surveillance footage, even a $3,500 payoff check from Smollett to the two brothers, whose sworn testimony was "locked in" before a grand jury.

On the day that charges were dropped, Foxx's top deputy, Joseph Magats, even defended the strength of the case, saying the dismissal was in no way an indication that Smollett was innocent.

"The fact that (Smollett) feels that we have exonerated him, we have not," Magats told the Tribune. "I can't make it any clearer than that."

Foxx, who had withdrawn from the case in February after revealing she had contact with Smollett's representatives early on in the investigation, also defended the strength of the evidence in a round of media interviews that week. But two days later, with the political fallout growing, Foxx wrote a Tribune op-ed saying for the first time that aspects of the evidence and testimony "would have made securing a conviction against Smollett uncertain."

"For a variety of reasons, including public statements made about the evidence in this case, my office believed the likelihood of securing a conviction was not certain," Foxx wrote without elaborating.

Smollett's attorneys believe Foxx was referring to conflicting statements made by Johnson as well as by the attorney for the brothers, particularly in describing some of the key evidence in the case as well as Smollett's alleged motive for staging the attack.

In detailing the findings of the three-week investigation, Johnson said at a nationally televised news conference on Feb. 21 that Smollett "attempted to gain attention" by sending a letter to himself at the "Empire" studios that contained threatening references to his race and homosexuality.

"When that didn't work, Smollett paid $3,500 to stage this attack and drag Chicago's reputation through the mud in the process," Johnson said. "This stunt was orchestrated by Smollett because he was dissatisfied with his salary. So he concocted a story about being attacked."

Asked directly by a reporter if the brothers, Abel and Ola Osundairo, had given police the information about the check and Smollett's motive, Johnson said, "Yes."

The lawyer for the brothers, though, said in a series of media interviews of her own that her clients had not told police that Smollett sent himself the letter or that he planned the hoax because he was unhappy on the set.

"Factually, Jussie never told them what the motive was," attorney Gloria Schmidt told the Tribune last week. "I wouldn't have them speculate on that."

Schmidt also said the brothers had told police that the $3,500 check was not actually a direct payment for the attack but ostensibly for training and nutrition that the brothers were providing to Smollett to help him shed pounds in advance of a music video shoot scheduled for Feb. 23.

"It's complicated," Schmidt said in one interview, characterizing the check as a legitimate payment for training but with a "wink" that Smollett also expected the brothers to do him a favor by taking part in the hoax.

Schmidt clarified the remarks in her interview with the Tribune, saying Smollett wrote the check not long after asking the brothers to "do something for me."

"My conclusion was that the money was for the training but as a front for their participation in the attack," she said.

Smollett's attorneys said the motive alleged by Johnson made no sense and had not been properly investigated by the police. Not only was Smollett's role as Jamal Lyon a pivotal part of the ongoing "Empire" story line, but he also was pleased with his treatment by the studio, his attorneys said. After rumors spread that Smollett staged the attack because he'd heard he was being written off the show, the Fox network issued a statement calling the assertion "patently ridiculous."

By the time that Smollett's case was brought to court, the alleged motive had shifted somewhat. Prosecutors made no direct reference in the bond proffer to the actor being upset about his pay. Instead, prosecutors said Smollett indicated to the brothers "his displeasure" with the studio's handling of the threatening letter.

Holmes said she made it clear to prosecutors that if the case went to trial, she intended to grill both Johnson and Schmidt under oath about their statements concerning Smollett's alleged motive.

"Hearing (the brothers') lawyer out there saying different things and contradicting herself, I'm calling her as a witness, right?" Holmes said. "So how is that going to make your case look? So now that creates all kinds of issues."

If Foxx was indeed referencing her public statements as impacting the decision to dismiss charges, Schmidt said in her interview with the Tribune, the criticism is off base.

"I'd like to know specifically what (Foxx is) saying would have hurt her case," Schmidt said. "She's just finding a reason to blame us, I think, for her lack of conviction in securing a verdict."

Schmidt also said it was highly unlikely she could have been forced to take the witness stand.

"They'd have to file a motion to disqualify me, and even if that motion were granted, then I have an attorney-client privilege with my clients, so no one can order me to talk about things that fall under that privilege," she said. "I know I'm doing my job when that's what the other side wants to do — call me as a witness. It's not my first rodeo on that."

## 'Completely bamboozled'

Police say they were able to corroborate the brothers' story about the hoax by reviewing footage from dozens of police and private surveillance cameras showing the brothers' movements before and after the attack. But despite all the surveillance video and other evidence in the case, it seemed clear that the Osundairo brothers' testimony would be crucial in proving Smollett guilty.

The actor's seasoned attorneys believed they had plenty of ammunition to attack their credibility, including evidence of drug dealing, purportedly homophobic tweets sent by Ola Osundairo in 2015 and Ola's aggravated battery conviction for a violent 2011 attack in Chicago's Lakeview neighborhood.

"If the credibility of your witnesses is sunk, then you can't carry your burden of proof," said Brian Watson, one of Smollett's Chicago-based attorneys. "You cannot put a witness on the stand and think you can carry your burden when they've probably contradicted themselves, when they have every motive to create a story that exculpates themselves."

They also said that much of the evidence, particularly text messages and phone records between Smollett and the brothers, was taken out of context. Instead of proving a conspiracy, the communications showed that the brothers knew exactly where Smollett was going to be on the night he was attacked, the actor's attorneys said.

There were also numerous phone calls and text messages between Smollett and Abel Osundairo both before and after the attack, according to court records. One text sent by Smollett four days before the incident was held up by prosecutors as evidence that the plot was being hatched.

"Might need your help on the low," read Smollett's text on Jan. 25, according to prosecutors. "You around to meet up and talk face to face?"

Smollett's attorneys said the brothers only came up with their story that the attack was staged after two days in custody and under threat of facing felony hate crime charges. They questioned whether information had been fed to them by their attorney, who knew that police suspected the attack was a hoax and came up with details that "fit that narrative."

"All of their evidence just ties the brothers to the crime," said Tina Glandian, a New York-based attorney with Geragos' firm. "There isn't a single piece of corroborating evidence for the brothers' story other than their self-serving statements that were made only after they were facing (possible) charges."

Schmidt, however, told the Tribune the brothers were immediately willing to cooperate with police and that she never believed they were genuinely in danger of being criminally charged.

Glandian said text messages not disclosed by the police showed the brothers were indeed coordinating workout times with Smollett and providing dietary instructions. On the night of the attack, Smollett was supposed to train with the brothers after he flew back to Chicago, but his flight was delayed in New York for several hours and he had to cancel their plans, Glandian said.

Among the messages that were taken out of context by police was the one about Smollett asking Abel for help "on the low," Glandian said. She said the actor was actually asking the brothers to get him an illegal steroid-like supplement available in Nigeria that would help him cut weight quickly.

"When (prosecutors) say their case had problems, I think that they knew, placed into context, these things make a lot more sense with the truth as opposed to the brothers' concocted story," Glandian said.

When told of the defense's claim about the meaning of the "on the low" text, Schmidt laughed, saying that providing steroids to a client goes against their "code."

"Their platform — the brothers' — is all about being steroid-free," she said. "Their whole thing is, you know, all-natural bodybuilding. It's ridiculous."

Schmidt also said the brothers were never in danger of being criminally charged, so they never asked for any kind of immunity in exchange for their testimony. Schmidt said she was alongside the brothers for their interviews with police and their testimony before a Cook County grand jury. At every step, she said, their story has been consistent.

"There was nothing that didn't jibe," Schmidt said. "There was nothing that was not factual, that was not consistent with what they had reported to police."

Schmidt said she was as stunned as everybody when she learned the charges had been dropped. She had talked with the prosecutors' office just days before and was given no indication of a problem. In fact, the Osundairo brothers had been assigned a victim-witness liaison from Foxx's office to help them through the process of preparing for trial.

Schmidt was packing for a spring break trip with her family when she saw the breaking news reports that the charges had been abruptly dropped.

"No notice," she said. "The opposite. The impression of us moving forward and then, completely bamboozled."

*Tribune's Jeremy Gorner and Annie Sweeney contributed.*

*jmeisner@chicagotribune.com*

*mcrepeau@chicagotribune.com*

*Twitter @jmetr22b*

*Twitter @creapeau*

**MORE COVERAGE**

**'Empire' actor Jussie Smollett's lawyer refuses Chicago's demand of $130K, says actor 'will not be intimidated' »**

**Kim Foxx welcomes independent investigation of office's handling of Jussie Smollett case »**

**Read Mayor Emanuel, Chicago top cop's comments about Jussie Smollett charges being dropped »**

Copyright © 2019, Chicago Tribune

# EXHIBIT B

Osundairo and Osundairo vs Geragos, Glandian, and Geragos & Geragos Law Firm

Audio Transcription

Taken on: June 08, 2019



**LEXITAS™**
180 North LaSalle Street, Suite 2800
Chicago, IL 60601
312.236.6936
877.653.6736
www.lexitaslegal.com

1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3    OLABINJO OSUNDAIRO and              )
     ABIMBOLA OSUNDAIRO,                 )
4    Individually,                       )
                                         )
5                         Plaintiffs,    )
                                         )
6              vs.                       )
     MARK GERAGOS, TINA GLANDIAN, and )
7    GERAGOS & GERAGOS LAW FIRM,         )
                                         )
8                         Defendants.    )

9

10           The audio recording from 4/6/2019 held in the

11   above matter were taken down stenographically to the

12   best of her ability by Traci L. Gidley, Certified

13   Shorthand Reporter, Registered Professional Reporter,

14   and Notary Public, at 180 North LaSalle Street,

15   Suite 2800, Chicago, Illinois, commencing at 5:00 p.m.

16   on June 8, 2019.

17

18

19

20

21

22

23

24



1          (Whereupon, the beginning of the

2          recording from 4/6/19.)

3     UNIDENTIFIED ANNOUNCER:  This is Reasonable Doubt

4  with your hosts Mark Geragos and Adam Corolla.

5     MR. COROLLA:  May I get it on, got to on, judgment

6  get it on, mandate get it on, and welcome to the best

7  hour in the universe.  It's Reasonable Doubt.  I'm Adam

8  Corolla.  It's Mark Geragos over there.

9          Mark, you're calling from where?

10    MR. GERAGOS:  I'm calling from New York.  I'm

11  getting prepared to pick a jury on Monday in Federal

12  Court here in Brooklyn.  And (unintelligible) I really

13  like the fact that we do Reasonable Doubt on Friday

14  (unintelligible.)  That's -- It's my favorite.

15    MR. COROLLA:  Sorry.

16    MR. GERAGOS:  It's the perfect way to cap the week.

17    MR. COROLLA:  I agree.  The phone was a little

18  screwy for a second, but we got the gist of what you're

19  saying.

20          Tina Glandian -- I think I'm pronouncing that

21  right -- is one of your associates, right?

22    MR. GERAGOS:  Yep.  She's -- She runs the New York

23  office.

24    MR. COROLLA:  And she's Jussie Smollett's attorney,



1    as well, right?

2         MR. GERAGOS:  Correct.  Correct.  And I think she's

3    going to call in here shortly.

4         MR. COROLLA:  Yeah.  I think we're going to grab

5    here.

6         MR. GERAGOS:  And -- And She's the one -- She's the

7    one who in the pictures, if you see in court, has kind

8    of -- looks to be -- I won't tell her age, I think that

9    that's a problem -- she looks young --

10        MR. COROLLA:  Yes.

11        MR. GERAGOS:  -- long kind of blondish hair.

12        MR. COROLLA:  Yes.  I -- I can see her in my mind's

13   eye.  And --

14        MR. GERAGOS:  Right.

15        MR. COROLLA:  -- we'll talk to her.  So breaking --

16        MR. GERAGOS:  And quite a week -- Quite a week in

17   Smollettland.

18        MR. COROLLA:  Well, I'm going to set the table by

19   saying I've never gotten more hateful Tweets in my life

20   than after discussing the Smollett case with Mark

21   Geragos.  So I now know what it's like --

22        MR. GERAGOS:  Right.

23        MR. COROLLA:  -- to be, like, a hated politician or

24   something.  And I -- I got to be honest, when I sit



1    around other celebrities and other folks and they go,

2    Oh, you know, all the haters, all the haters out there,

3    all the haters.  And I never want to say anything, but

4    my fans are great.  I read almost no negative Tweets

5    about me, and it was all awesome until last week.  And

6    then --

7         MR. GERAGOS:  I know.  It's -- And then they came

8    out, and it was the -- and the level of, how should I

9    put it, just kind of vitriol --

10        MR. COROLLA:  Yeah.

11        MR. GERAGOS:  -- is -- is that next level.  I don't

12   even get it.  I -- It -- It really -- They -- There are

13   certain cases and certain things that just hit a nerve,

14   and this, obviously, is one of them.  It just hits a

15   nerve.

16             I think I told you the first -- the first week

17   when he came in and I was talking with him and I just

18   finished a -- wrapped up Kaepernick, and then this case

19   came in, and I was like -- I -- I think I said I could

20   have just kind of ridden into the sunset on a high, but

21   I guess I -- I just love to rile up the crazies.  I

22   don't know.

23        MR. COROLLA:  Well, you're --

24        MR. GERAGOS:  (Unintelligible.)



1      MR. COROLLA:  -- you're definitely one of those

2   people.  There's -- There's two kinds of people.

3   There's one kind of person that has a toothache, so they

4   immediately go to the dentist.  And then there's another

5   kind of person that has a toothache, so they flick it

6   with their tongue three times a day so it makes them

7   feel like they're alive.  So if you're a teenage girl,

8   you definitely cut on yourself.  There's no doubt about

9   it.

10         Tina -- Attorney Tina, Gary, is going to pop

11   up on one lines, but I'm not seeing her -- oh.  Now she

12   is on --

13      MR. GERAGOS:  I think she's trying in --

14      MR. COROLLA:  Tina --

15      MR. GERAGOS:  While we're waiting for that, can I

16   say one thing?

17      MR. COROLLA:  Yeah.  Go ahead.

18         Just put her on hold, Gary.

19              (4:56 into the podcast was a

20              commercial for Tommy John.)

21      MR. COROLLA:  So Tina's on Line 5.  Tina is

22   Jussie's attorney.

23         Tina, can you hear -- can you hear us?

24      MS. GLANDIAN:  I can hear you, yes.



1        MR. COROLLA:  Oh.  That's good.  Thank you.

2            All right.  So let's see if we can work Gary's

3    technological miracle here of having everyone in a

4    different state and putting it all together on the same

5    podcast.

6            So breaking news which is City of Chicago

7    wants 130 large as reimbursement.

8            First, catch us up on -- on that piece of

9    news, if you could, Tina.

10       MS. GLANDIAN:  Sure.  So we -- we sent a response

11   back.  They had given us a deadline of a week, which was

12   totally arbitrary.  They, obviously, don't have to do

13   anything within a week.  But we responded by letter,

14   basically, setting forth all the reasons why they can't

15   do what they're trying to do, and then -- so saying, you

16   know what, if they -- if they insist on moving forward,

17   we're happy to do so.

18           We plan to takes the depositions of Mayor Rahm

19   Emanuel, Eddie Johnson, a couple of others, their

20   attorneys, and let the public actually hear the truth in

21   this case.

22       MR. COROLLA:  I'm guessing you guys -- and -- and

23   this -- I don't know if this would be unprecedented.  I

24   don't -- I've never heard of a time of when they were



1  re-compensated or compensated for a case that they

2  dropped, but has it ever happened in the annuls of court

3  history, as far as you know?

4      MS. GLANDIAN:  Not from our research, no.  And the

5  statute they're actually relying on is not -- this is

6  kind of part of Chicago's off claims act statute which

7  is really not for anything like this, and our research

8  hasn't -- has disclosed no cases where it's been used

9  for (unintelligible) and, you know, for an

10  investigation.  So it's totally unprecedented, and I

11  think the way they're trying to apply this is totally

12  unconstitutional under the facts of this case.

13      MR. COROLLA:  Are they attempting to save face in

14  the public's eye because the outrage amongst the public

15  was -- was so -- was so demonstrative?

16      MS. GLANDIAN:  Yeah.  I think that's exactly what

17  they're trying to do by this.

18      MR. COROLLA:  Is -- Is -- Are you guys -- maybe

19  this is more of a question for Mark -- we don't have to

20  get into numbers here, but you're talking about throwing

21  good money after bad here.  I mean, when you're talking

22  about sitting down and deposing the mayor and the police

23  chief and -- you know, over a case that there's no pot

24  of gold at the end of the rainbow.



1    Kaepernick suing the NFL, I get the upside of

2    that, this, no -- no financial upside.  So what's in it

3    for you?  How's it working?  Who pays the bills?

4         MR. GERAGOS:  You know, that's a very interesting

5    thing because people often ask why do you do this or why

6    don't you.

7         And especially for haters, the thing that I

8    think they should understand is if they're going to do

9    this to somebody -- and, by the way, you know, the same

10   person who's got three followers who's vitriol because

11   they know he's guilty even though they've never seen the

12   discovery because it's never been released and there --

13   the file is sealed, but they're positive because the

14   Chicago superintendent and police went on TV and made

15   this -- this case which was demonstrably wrong, and then

16   Ms. State's Attorney, when they took a look at the file,

17   stood up, and dismissed it knowing, of course, that

18   anybody who -- who's ever practiced in the criminal law

19   field know that to get a prosecutor to dismiss, you must

20   have -- you must have an issue.

21        And, clearly, as I've said on a couple of the

22   previous episodes, the issue here was that the

23   superintendent of police went out there and said

24   demonstrably false things.  They knew that they couldn't



1    back it up, they knew that ethically that that was a

2    real challenge because you're not supposed to go out

3    there and do that.

4            And so the State's Attorney did something that

5    was brave and said, Look, it's a Class 4 felony.  We're

6    not going to get into this.  We don't have

7    corroboration, which is what I said from Day 1.  And

8    what I mean by corroboration is just because somebody

9    says you did something or somebody says you knew

10   something does not mean that you did.  That's not

11   America.  That might be North Korea, that might be the

12   old Soviet Union, but it's not the American criminal

13   justice system.

14       MR. COROLLA:  Circling back to the question --

15       MR. GERAGOS:  Just going back to your answer is if

16   I get this dismissed and then I tell the guy, Oh, just

17   write them a check so that Rahm Emanuel, the diminutive

18   outgoing mayor of Chicago, can showboat on his way out

19   the door because, like, he didn't -- mind you, this is

20   the same guy and the same people who are so

21   (unintelligible) the first people who will tell you that

22   he ran the city into the ground, and he couldn't get

23   re-elected, and the superintendent of police is not

24   going to be superintendent of police for much longer,



1   either, because they just elected a new mayor.

2            If I'm going to walk away from that and say,

3   Okay, you can go showboat, that's it, then why am I

4   doing what I do?

5            So, yeah, I don't always do it for the money.

6   There are mixed motivations.  If I always did it for the

7   money -- I've said this to my young lawyers -- there are

8   easier ways to make a living than to do what we do.

9   So --

10      MR. COROLLA:  So this -- this falls -- This

11   falls --

12      MR. GERAGOS:  At a certain point --

13      MR. COROLLA:  -- under the heading of

14   (unintelligible.)

15      MR. GERAGOS:  -- somebody needs -- yeah, it really

16   does.

17      MR. COROLLA:  Well, I mean, Jussie --

18      MR. GERAGOS:  It is.

19      MR. COROLLA:  I'm just -- I'm just trying to ask --

20   I'm trying to anticipate all the horrible questions I

21   get via Twitter the next day when they want to know, Why

22   didn't you ask him this and why didn't you ask him that?

23            So I'm guessing at your hourly rate, your

24   standard rate, Jussie Smollett is not paying you to



1    continue billing him on an hourly rate; this is

2    something that you guys have picked up, maybe sort of

3    pro bono, and said, This is more than a payday; this is

4    something -- this is a --

5        MR. GERAGOS:  Right.  Let's --

6        MR. COROLLA:  -- wrong that needs to be righted.

7        MR. GERAGOS:  Let's not get excess- -- Let's not

8    get excessive about pro bono, but at the same time --

9        MS. GLANDIAN:  I'm trying to twist Mark's arm on

10   that, but I don't know if we're there yet.

11       MR. GERAGOS:  Yeah.  Tina would -- Yeah.  Tina --

12       MS. GLANDIAN:  I would do this pro bono.

13       MR. GERAGOS:  Tina -- Tina may be pro bono.  I -- I

14   consider it more for the principal.

15       MR. COROLLA:  Yeah.

16       MR. GERAGOS:  I just don't think that a pol- -- I

17   really feel strongly that if a prosecutor stands up and

18   does the right thing and says, I looked at the evidence,

19   and there -- we couldn't make our case, and so I'm going

20   to dismiss, and then some politician showboats on the

21   back of that -- and that's exactly what it was; it was

22   grandstanding -- that somebody's got to stand up for it.

23   If you don't do that, then why where are you practicing

24   law?



1          And, by the way, the -- the vitral -- as you

2     know, I kind of do -- I -- I don't mind it, I -- you

3     know, I find some solace in the people who are critics.

4     If it were somebody who I thought had thought about it

5     or had a nuanced view about it or had actually examined

6     it, then I probably would be concerned.  But if it's

7     somebody who's just unhinged, that's fine.  I get it.

8          But, you know, the first time that same critic

9     gets on a 52/50 hold for 14 days just because there --

10    they're -- they're psycho, but they're not a threat to

11    themselves or others, they would want somebody who

12    challenges the State's authority of -- unbridled

13    authority.

14         This is bullshit.  It's just bullshit that

15    you -- they haven't proven a case, and that the mayor

16    gets out there, grandstands it, and wants to then -- she

17    used a statute that has never been intended to be used

18    this way to -- to, basically, frighten people.  And, you

19    know, there is an old adage about if you don't take a

20    stand at a certain point and then -- especially in the

21    law -- then guess what?  Then they expand it even

22    farther.  That's what the law is all about.

23         MR. COROLLA:  All right.  So, Tina, you were on

24    Good Morning whatever last week or whenever it was and



1   you were --

2        MS. GLANDIAN:  Right.

3        MR. COROLLA:  -- talking about the theory about

4   possible white face.  I think most people didn't agree

5   with that theory.

6            But what is the general concept in -- in broad

7   strokes of what happened that night, according to your

8   client?  Just to hear it from your -- your mouth.

9        MS. GLANDIAN:  Sure.  So what happened that night

10  is so -- as you know, he had hired the brother -- the

11  one brother.  And, again, just to -- to make sure that

12  this is clear, he only really had a relationship with

13  one brother.  The older brother, he had only met on a

14  handful of occasions, so silly through the younger

15  brother who he was friendlier with, and, you know, he

16  didn't have the phone number for the older brother.

17  They never, you know, on their own communicated.  This

18  wasn't somebody he knew, again, more than just in

19  passing through the younger brother.

20           But, anyway, so he had hired Abimbola who he

21  knew as Bon who I think has been referred to as Able in

22  this case to train him for this upcoming music video,

23  and they were in constant communication.  And, again,

24  there's dozens of texts between them that show that he



1    had been hired for the nutrition and training, and that

2    they were going back and forth with the -- with, you

3    know, a nutrition plan, training plan, and plaining

4    workouts and things of that nature.

5           And so Jussie was actually flying back from

6    New York that day, and they were supposed to train that

7    evening after he landed.  He was supposed to originally

8    get in around 8:00 o'clock, and they were going to train

9    around 9:00 o'clock.  And so he ends up sitting -- his

10   flight's delayed, ends up being delayed for four hours

11   on the tarmac, and he's sending lots of texts.  And,

12   again, it's not just to Olab and Able -- not just to

13   Able, but, you know, many people he's interacting with.

14   But he is going back and forth with Able because, again,

15   they're supposed to meet later that night.

16          So at some point when it's delayed as much as

17   it is and now he's getting in close to midnight, he

18   basically -- you know, there was a brief call between

19   them, and he lets him know that, you know, We're no

20   longer going to train tonight.  Like, I just landed and

21   it's really late, and so we'll just do our morning

22   workout as planned.

23          And somewhere in that conversation, he -- the

24   trainer tells him, you know, just make sure eat tomorrow



1  and he's given him a nutrition plan.  He's supposed to

2  eat, you know, kind of -- he has a regimented diet

3  and -- including four eggs and whatnot.  And so Jussie

4  said I'm going to have to run out and get some.  I don't

5  think I have any, but I'm make sure to go out and get

6  some eggs and, you know, eat.

7          So he was picked up that night.  He had his

8  creative director was staying at Jussie's place.  And so

9  his creative director picks him up, takes him home.

10 Once they get home, he then leaves, he's headed to

11 Walgreen's to go get some food for -- I mean, he's

12 hungry.  He's been kind of on this flight delayed, he's

13 been sitting on a plane for seven hours, well, he wants

14 to get something to eat, he wants to get the eggs for

15 the morning.  And so walks towards Walgreens except it's

16 closed as he approaches.  He thought it was 24 hours,

17 and it turns out it's not, and then decides to go to

18 Subway.

19          He calls Frank, who's his creative director,

20 to see if Frank wants anything from Subway now that he's

21 headed there.  Frank says -- the tuna sandwich was

22 actually for Frank.  So frank tells him what his order

23 is, and he heads in, goes to the store, buys, you know,

24 himself a salad, a water, and gets Frank his tuna



1   sandwich.

2        MR. COROLLA:  Oh.  Okay.  Let's stop for one

3   second, Tina.  Because so much early on was, If you

4   bought yourself a tuna sandwich, why would you still

5   have the tuna sandwich after --

6        MS. GLANDIAN:  Right.  And I'm going to get to that

7   because that's ridiculous.  People acts like he was

8   holding onto the sandwich during the whole incident.

9   And let me just walk you through it, and I'll -- I'll

10  include that --

11       MR. COROLLA:  So he gets the sand- -- I'm sorry.

12  He gets the salad, he eats the salad at the Subway?

13       MS. GLANDIAN:  No.  He gets this all to go.

14       MR. COROLLA:  Okay.  Sorry.  Continue.

15       MS. GLANDIAN:  He gets everything to go -- that's

16  okay.

17            And in the interim, he also is texting with

18  his music manager who he thought at that time who had

19  been in Australia -- he thinks he's in Australia.  He

20  texts him saying, I don't know what time it is there,

21  but, you know, whenever you're available, give me a

22  call.

23            Music manager calls him as he's leaving

24  Subway, and he's on the phone with him.  And he has his



1    actual telephone in his -- his cellphone in his pocket,

2    and he has an earpiece in one of his ears.  And so

3    that's happening as he leaves Subway.

4            And at some point, you know, when he's getting

5    closer to his home -- and I don't know if this is clear,

6    as well, where this happened is right outside of his --

7    so it's right by the stairwell there.  This wasn't, you

8    know, randomly in the middle of -- kind of the street

9    away from -- from this is -- you know, people knew where

10   to find him.  This was right outside of his place.

11           Anyway, as he is nearing his apartment, that's

12   when, you know, he hears the yelling from behind.  As

13   he's talking to his music manager, turns around, the

14   attack happens, and during this whole time -- so his

15   cellphone stays on during the entirety of the attack.

16   It falls out of his pocket, is laying on the sidewalk.

17   At some point, they're on the floor kind of hustling and

18   fighting while, you know -- he's getting kicked while

19   he's on the floor.  And at some point, the -- the two

20   guys run off.

21           And he sits up, he realizes the phone is still

22   on, he picks it up, and his music manager is, you know,

23   kind of very concerned.  Obviously, he's heard what --

24   what has happened, you know, how he -- what happened



1   and -- and, at that point, Jussie want to chase after

2   these guys.  And he tells them, you know, I'm running

3   after them -- you know, because he realizes that what

4   made him realize that is that's the first time he saw

5   the noose thrown around his neck.

6          And so he says that he's going to go after

7   them, and the manager is asking him where he is, he

8   finds out he's outside his place tells, and, like, begs

9   him and tells him, No.  You have to go inside.  You

10  don't know if they have weapons, you don't know who they

11  are, what they are, and he just tells him, You have to

12  go inside.  You have to go inside.

13         So he gets up, gathers everything that has

14  fallen -- and so his phone had fallen -- and grabs the

15  bag (unintelligible) grabbing whatever is yours, and he

16  goes inside --

17     MR. COROLLA:  Right.

18     MS. GLANDIAN:  -- and he encounters his -- the

19  concierges at his building who, again, corroborates --

20  you know, there was some -- again, Eddie Johnson came

21  forward and said there was self-inflicted wounds.  The

22  conci- -- which, again, is out of thin air, completely

23  fabricated.  Because, first of all, the brothers come

24  forward and they say that we attacked him, and we



1  punched him, and we did these things, and then the

2  concierges also confirm that, you know, it's in the

3  police report that when he walks into the building, he

4  has scratches on his face and, you know, his hooded

5  sweatshirt was, you know, wet and dirty.

6          And, anyway, so he goes upstairs.  He tells

7  him that he was jumped, and, you know, he's not really

8  responsive.  And he ends up going upstairs.  And he goes

9  up where Frank is, and he doesn't want to call the

10 police.  Again, he -- As everyone who knows him will say

11 is generally he's a very private person, didn't want the

12 attention from this, is, you know, adamant that they not

13 kind of let this get out.  And Frank says, No.  This is

14 really serious.

15         And, again, there is a lot of realtime text

16 messages between Frank and other people close to him,

17 including his music manager who, at this point, is very

18 concerned because he heard, you know, what had happened.

19 Obviously, he was on the phone, and they're all texting

20 saying, you know, he doesn't -- he didn't want to call

21 the police.  And Frank says, I ended up calling the

22 police because he was trying to be proud.  He didn't

23 want do this --

24         MR. COROLLA:  Right.



1      MS. GLANDIAN:  -- and he didn't want to -- he

2   didn't even want to go to the hospital.

3      MR. COROLLA:  Okay.  So that --

4      MS. GLANDIAN:  (Unintelligible) the police report

5   said that he did not want to call the police

6   (unintelligible.)

7      MR. COROLLA:  That -- That makes a lot of sense

8   with the sandwich, when you put it into that context

9   versus the, I held the sandwich the whole time.

10      MS. GLANDIAN:  Sure.

11      MR. COROLLA:  I was beaten in the street.

12          But now that leads us back to cellphones and

13   cellphone records and turning in --

14      MS. GLANDIAN:  Sure.

15      MR. COROLLA:  -- cellphones.

16          Couldn't this all be cleared up with that or

17   you tell me -- I'll -- I'll ask the tough questions.

18          How come we don't get the cellphone records

19   and the cellphones and corroborate all this stuff?

20      MS. GLANDIAN:  Well, they have.  I mean, the police

21   have all the cellphone records.  They, obviously -- I

22   think, you know, subpoenaed the records, they have it

23   from -- they have the -- the communication.

24          He had provided -- you know, there was a lot



1    of talk about how he provided redacted phone records,

2    but, again, that was another myth.  He never redacted

3    any information.  What he provided was, you know, the

4    phone records from right before the attack 'til -- 'til

5    afterwards because that's what he, at the time, thought

6    was, you know, relevant to produce.

7              And, again, he is a public figure.  Early on

8    in this case, things were leaking so fast, and he --

9    when he was asked to -- initially, they asked him to

10   provide his entire phone, and he just wasn't

11   comfortable.  He had lots of photographs on it, he has

12   contact information, and other text messages, and he

13   didn't want to -- didn't want to have to turn this over

14   where he could provide whatever information they need in

15   more of a controlled setting.

16             But, again, there wasn't -- it's not like from

17   during -- from before or after the incident he redacted

18   calls he made or texts or anything of that nature.  He

19   provided the full information.

20   MR. COROLLA:  I'm (unintelligible) when it comes to

21   technology.

22             Did -- Are you able to read a transcript or

23   see the text or hear a recording?  Like, what -- how --

24   how in-depth are you and can you get with the cellphone



1   records, quote/unquote?

2       MS. GLANDIAN:  So we've seen -- Well, we've seen

3   all of the text messages.  And, again, the police have

4   all of the text messages.  And there's nothing -- you

5   know, as Mark was says earlier, there is zero

6   independent corroboration in this case.  There's a

7   couple things that they've taken -- you know, police

8   have taken out of context and tried to make it something

9   that it isn't.

10          And so I think one of the -- I think really

11  the -- the one that they relied on the most completely

12  taken out of text was a text message where Jussie texted

13  Able and said, Hey, can you meet me and talk -- you

14  know, talk on the low, kind of face-to-face.  And,

15  again, this is somebody who he regularly is seeing.  At

16  this point, they're working out, and that text -- you

17  know, they took out of context to try to say that -- and

18  this was a few days before the attack.

19          So the police theory and what the prosecutor,

20  you know, said in her proffer was that that's when, you

21  know, he meets up with him, and in this brief, you know,

22  I don't know, it's a seven- or eight-minute

23  conversation, plans out this whole attack.  And, in

24  fact, if you, actually, look at the text messages, you



1    know, what -- what he's actually referring to in that is

2    that when he had first started talking to Able about

3    doing this workout plan -- and he was trying to shed

4    about 20 pounds for the music video because he had to be

5    shirtless --

6         MR. COROLLA:  Uh-huh.

7         MS. GLANDIAN:  -- and he -- Able had told him

8    that -- you know, because they were about to -- him and

9    his brother were about to go to Nigeria.  He said

10   there's these herbal steroids you can take that

11   really -- that are illegal here in the US but that I can

12   get in Nigeria, and it helps you shed fat very quickly.

13   So if you are interested, let me know.

14            And so, at this point, Jussie -- you know, if

15   you read the text messages, he's actually texting him,

16   they're talking about the nutrition, they're talking

17   about the workout plan and all of that.  And then in the

18   midst of one of the texts which, you know, was -- in

19   context, if you read it, he says, you know, Can you

20   actually -- Hey, meet up with me.  You know, I want to

21   talk to you face-to-face, because he wanted to tell him

22   to get these steroids from Nigeria, and he didn't want

23   to put that in a text.  He was just being cautious and

24   thought, you know, When I see him, I'll tell him rather



1    than -- but, you know, it's absurd when you think of

2    that being the text that led to all of this in the

3    context of what they're talking about.

4        MR. COROLLA:  And -- All right.  Much like the

5    sandwich, that's -- definitely make sense now.

6            And, just for people listening who are going

7    to send me horrible Tweets, I'm really here trying to

8    figure out what makes -- what is possible and what's not

9    possible.  So when you hear their version on the low,

10   you go, Whoa, why do you need to talk to your personal

11   trainer on the low unless it's -- well, if your personal

12   trainer is going to Nigeria, and he was going to get you

13   some human growth hormone, and you didn't want this

14   out -- out in the whateversphere, then you could.  And

15   I'm not saying it absolutely was; I'm just saying we

16   have a context now.

17           So --

18       MS. GLANDIAN:  Right.

19       MR. COROLLA:  -- motivation, what would be the

20   motivation for these fellas, Able and his -- his older

21   brother to do this?

22       MS. GLANDIAN:  Right.  And that's -- I mean, that's

23   a great question.  Because you really have to -- It's

24   not even just what -- what their motivation would be,



1   but you have (unintelligible), you know, both possible

2   motivations.

3           So what their motivation would be -- and,

4   again, keep in mind these are two brothers who came

5   forward when all this happened and put out a statement,

6   We're not homophobic, you know, and strongly took that

7   position.

8           And shortly after, it was revealed that there

9   was, in fact, not only homophobic Tweets from their

10  Twitter account from several years ago, but two

11  independent people came forward from Empire and said,

12  you know, Able had actually made extremely homophobic

13  comments early on when he had, you know, been on the

14  show where it was quite surprising, you know, using the

15  word faggot and saying, I would never be friends with

16  someone who was gay, and just, you know, taking a really

17  strong homophobic stance on things.

18          And so, you know, that came out.  And then,

19  you know, in talking to Jussie, I found it out that, you

20  know, he and Able had been hanging out a lot and they

21  were friends, and, you know, he was not just his

22  trainer, but they were actually friends, and they would

23  socialize and go out.  And about ten days before the

24  incident, Able actually spent the night at Jussie's



1    place.

2              And my theory, at least, is that, you know,

3    the older brother who lived with Able saw that his

4    younger brother didn't come home, started wondering what

5    this relationship really is -- and keep in mind, Able is

6    also playing the role on the show, he's the stand-in for

7    Jussie's love interest.

8         MR. COROLLA:  Uh-huh.

9         MS. GLANDIAN:  And so I think -- you know, it's one

10   thing he's playing the -- the -- this character, now

11   he's hanging out with this openly gay man, and now he

12   spent the night there.  So I think he starts thinking to

13   himself, you know, what's really going on here.

14        MR. GERAGOS:  Wow.  Tina -- Tina Glandian with the

15   theory, the throw down theory and motive.

16        MR. COROLLA:  Well, you know --

17        MS. GLANDIAN:  Well, I have a very specific theory.

18        MR. COROLLA:  All right.  I'm -- I'm in.

19              Would -- But -- So I -- I don't know --

20        MS. GLANDIAN:  I think it was -- Just to finish

21   that, I think it was kind of a test, the older brother

22   testing the younger brother.  You know, they're leaving

23   for Nigeria, and I think he wants to make sure he

24   understands this relationship, and it's not what, you



1    know, he fears it might be.

2         MR. COROLLA:  It's -- It's -- It's definitely a

3    theory.  It's certainly a bunch of information we didn't

4    really have before.

5              I -- I don't know if you know, and I don't

6    know if you can express it if do you know it, but I've

7    had plenty of dudes spend the night at my bachelor pad

8    because they drank too much and didn't get laid and

9    ended up passing out, like, on the sofa kind of thing.

10             Do -- Was there a relationship or was it a

11   crashing on the sofa?

12        MS. GLANDIAN:  No.  But I'm saying -- What I'm

13   speaking to is what the older brother would have

14   thought --

15        MR. COROLLA:  I get it.

16        MS. GLANDIAN:  -- because he knows that Jussie is

17   openly gay.

18        MR. COROLLA:  Right.

19        MS. GLANDIAN:  And, you know, the brother is

20   playing the love interest (unintelligible.)

21        MR. GERAGOS:  Unlike -- Unlike Adam who had --

22        MR. COROLLA:  Closeted.

23        MR. GERAGOS:  -- never been accused of that.

24        MR. COROLLA:  I wish one gay guy would just hit on



1   me once.  Just once so I can say no or even maybe now.

2           So, okay, white -- white -- two white guys,

3   why would he say two white guys?

4       MS. GLANDIAN:  Okay.  That's again another --

5       MR. COROLLA:  What did he say?  What did he say?

6       MS. GLANDIAN:  He never said two white guys.  First

7   of all, he only saw one attacker.  He didn't -- The

8   other one kind of approached once he was already on the

9   floor and he was being kicked.  He never saw the second

10  attacker.

11          As far as the one who he did see, there was a

12  ski mask on his face, and, you know, this was, again,

13  a 30- to 45-second incident where the first point of

14  contact is a punch to his face.

15          But moving past that, you know -- and I know I

16  mentioned the white face makeup and all of that, and --

17  you know, but putting that aside for a second, it's

18  interesting because all of the initial reports that

19  Jussie gave all of the police reports, there's no

20  mention of any sort of reference to the attacker being

21  white.  That, you know, is something later that, you

22  know, he said was his memory of what happened, and I

23  think it's interesting how memory works.

24          If you actually kind of have an understanding



1  of it, it's not -- your brain isn't like a video camera

2  where if you want a memory, you just call it up and

3  press play.  Memory is constructed.  And so here you

4  have this incident that happened, and there's,

5  obviously, statements made and, you know, the overall

6  impression I think after the fact was he's trying to

7  construct the memory of what happened.  I think that's

8  when at some point this would only make sense to him

9  that it was -- you know, that that's what he -- he

10  thought --

11       MR. COROLLA:  Yeah.

12       MS. GLANDIAN:  -- he remembered.

13          You know, and, again, that's -- because to me

14  it's really significant that that's nowhere in any of

15  the initial police reports that were taken.

16       MR. COROLLA:  Yeah.

17       MS. GLANDIAN:  But then also, you know, yeah, I did

18  put that out there because that -- that exists, that's a

19  real -- you know, this is an actor who has access to

20  makeup.  Obviously, this attack was -- you know, they

21  used a number of props, so do I think it's ridiculous

22  that, you know, if they were going doing this with

23  all -- you know, with the ropes and the bleach that they

24  put in a little hot sauce bottle and everything else



1   that -- is it crazy that they would put, you know,

2   makeup under the ski mask?  I don't think that's crazy.

3         MR. COROLLA:  I have -- I have a theory, and,

4   obviously, it's going to be tough for either one of you

5   to comment on it, but it's -- I think it's -- I have a

6   hybrid theory, a -- a meet-in-the-middle theory.

7         MS. GLANDIAN:  Okay.

8         MR. COROLLA:  I'll -- I'll ask Gary --

9         GARY:  Sure.

10         MR. COROLLA:  -- what he thinks.

11          And -- And thank you for spending so much time

12   on this, Tina.  I find this really fascinating.

13         MS. GLANDIAN:  Sure.

14         MR. COROLLA:  I've started to formulate a theory

15   only based on talking to Mark and -- and Tina, and --

16   but I had it a few days ago.

17          I believe there could be a possibility of both

18   things happening.  I believe he could have been attacked

19   by these two brothers, and I believe he could have not

20   summoned the brothers or laid it out in advance or paid

21   them money or anything else.

22          I also believe he could have taken the attack

23   as an opportunity, whether it be conscious or not, he's

24   very pro left, he's very -- you know, the whole



1    movement, GLAAD, everything else, very anti-Trump.  I

2    believe he could have -- I'll say, for the sake of this

3    conversation, subconsciously turned it into an

4    opportunity to go, I hate this side so much, somebody

5    attacked me, it must be someone from that side.

6         GARY:  I can totally subscribe to that.

7         MS. GLANDIAN:  Well, let me --

8         GARY:  I -- I would say that, you know, maybe he's

9    just there -- he's so conditioned to be distrusting of

10   that side that when he got attacked, he thought, Well,

11   of course, it has -- that has to be a component of that

12   and just add it in there.

13        MR. COROLLA:  Yeah, Gary.  Like, when you hear

14   about --

15        MS. GLANDIAN:  Sure.

16        MR. COROLLA:  -- a drive-by shooting, you think

17   it's the other side; not me, but that's Gary.

18             Sorry.  Go ahead, Tina.

19        MS. GLANDIAN:  And I -- And that makes sense to me

20   as to his state of mind, you know, for -- you know,

21   let's say maybe thinking this was the person -- the

22   attacker was a white person.

23             Again, I don't -- you know, I think that

24   certainly could have been a fair kind of -- whether you



1    call it a mistake or unconscious kind of memory or

2    whatever, I -- I think that certainly could be true.  I

3    think -- obviously, I don't believe this was a hoax in

4    any way, but I think as far as the -- the kind

5    of publicity --

6          MR. COROLLA:  I'm sorry.  Tina, let me just --

7          MS. GLANDIAN:  I think it's important to know --

8          MR. COROLLA:  Let me just jump in for one second.

9          MS. GLANDIAN:  Sure.

10         MR. COROLLA:  I don't think -- I'm not saying hoax;

11   I'm saying something happened --

12         MR. GERAGOS:  Right.  He's saying that there's a --

13         MR. COROLLA:  -- to you, and you're sort of

14   spinning it in your mind.  Obvious -- There's a couple

15   things:  If you're ever attacked, it's sort of like a

16   car accident.  You really -- Your -- You go into fight

17   or flight, and your memory is really shady because

18   you're -- thank goodness, by the way, most people get in

19   car accidents, can't remember everything.  They just

20   remember waking up in the hospital or they remember the

21   firemen hitting them on the shoulder.  Even if they're

22   not knocked out, they go into a state, right?

23               And then later on, if you're trying to

24   reconstruct the accident, as it were, you go, Well, it



1   was probably a drunk driver who was speeding because

2   that's where you're reconstructing.

3          MS. GLANDIAN:  Right.

4          MR. COROLLA:  So I'm not saying hoax; I'm saying

5   reconstruction --

6          MS. GLANDIAN:  Yeah.  No.  No.  I agree with that.

7   I think that's absolutely --

8          MR. COROLLA:  -- with --

9          MS. GLANDIAN:  -- possible.

10         MR. COROLLA:  -- with a narrative, though, with --

11  with a possible narrative that suits your -- your --

12  your politics.

13         Sorry.  Go ahead.

14         MS. GLANDIAN:  But the thing is he actually never

15  wanted this to be public.  And that's where I -- I

16  disagree.  Because even the letter that was sent to

17  Empire a week before this happened, if you ask people at

18  Empire, he didn't -- he was going around the studio

19  begging people to keep this quiet because he didn't want

20  this to be something that defines him or that people are

21  talking about or, you -- you know, he didn't want that

22  to be public.

23         Then when this incident happened, he -- you

24  know, doesn't want to call the police, he doesn't want



1   to go to a hospital, he wants to keep this quiet.  And,

2   you know, after the fact, he had actually been offered

3   to go on stage with Alicia Keys at the Grammys, you

4   know, to kind of talk about what happened and to, you

5   know, just speak on this, and he declined that.

6             And there is, again, text messages and a -- a

7   witness who had come forward from -- who is the booker

8   for the Grammys who said, Oh, yeah, you know, I got a

9   text message that says, Tell Alicia, you know, thank

10  you.  I love her.  Thanks for thinking of me, but I'm

11  not ready.  And, you know, he -- he declined because,

12  again, he did not want this to be something that he's

13  out there talking about and making it a story or a

14  headline or anything else.

15            And so it's completely inconsistent with a lot

16  of the, you know, theory out there --

17       MR. COROLLA:  Well --

18       MS. GLANDIAN:  -- whether it's -- it's what you're

19  saying or whether this was a hoax.  Obviously, the only

20  reason you would do a hoax is so you can speak about it

21  and you can publicize it, and this is someone who wanted

22  to keep this private.

23       MR. COROLLA:  He -- Well, he sat down with Robin

24  Roberts.



1          MS. GLANDIAN:  Well, the GMA -- yes.

2          MR. COROLLA:  I can't remember who he sat down

3  with.

4          MS. GLANDIAN:  The GMA interview.

5          MR. GERAGOS:  Robin Roberts, exactly.

6          MR. COROLLA:  Sorry.

7          MS. GLANDIAN:  Yeah.  But the only reason he did

8  GMA was, at that point, the narrative had completely

9  shifted where everyone thought he had made this up.  And

10  so it was kind of a reaction to that.  This isn't

11  something he did when -- you know, when people still

12  believed he was a victim.  This was when everybody had

13  come forward doubting his story, and he was pushed into,

14  You have to go out.  The public has to hear from you.

15          And, you know, that's why he -- he's on there,

16  and he sounds defensive because he had to put in a

17  defensive position to try to explain that he's telling

18  the truth.

19          MR. COROLLA:  So, once again, he didn't want

20  publicity, but when he did publicity, it's because this

21  thing got too far down the road, and now he felt like he

22  needed to make a statement.

23          MS. GLANDIAN:  Exactly.

24          MR. COROLLA:  Predictions:  Where are we a month



1   from now with this entire endeavor, besides 5 million

2   Tweets calling me a dick head?

3           Gary says we're up to 7.5 million now, it's

4   not 5.  Sorry.  It's a whole week -- or a month.

5           Where -- Where are -- Where are we a week from

6   now?  A month from now?

7           MR. GERAGOS:  This is your first -- This is your

8   first hater in your whole experience?  You get Hollywod

9   hate.

10          MR. COROLLA:  I don't have thick skin like you,

11  Mark.  I -- I -- I -- I -- I was home reading my Tweets,

12  and I was about -- the third one calling me an asshole,

13  and I really went, like, What's going on in the air.

14  I -- I get a lot of praise.

15          MR. GERAGOS:  Why am I'm friends with Geragos?  I

16  want -- (unintelligible) friendship.

17          MR. COROLLA:  Oh, my, God.  That's the No. 1

18  subject line.

19          All right.  Sorry.  Predictions --

20          MS. GLANDIAN:  Well, it depends.  I think if -- if

21  City of Chicago does the right thing, then a month from

22  now, Jussie is finally trying to just move forward with

23  his life and actually heal from this and just move on.

24          If they want it persist down this path, I



1   think we'll be in litigation with -- you know, probably

2   for a while to come.  So I think it will really depend

3   on their next move.  I think, again, in our letter, we

4   point out all the reasons why they can't and shouldn't

5   file the civil lawsuit against Jussie, but we'll see

6   what they do.

7          MR. COROLLA:  I -- I get the feeling that that they

8   don't want to call the bluff because once you guys start

9   rummaging through their trunk, you're going to find a

10  lot of -- of goodies.

11              Tina Glandian, is that how I'm -- pronounce

12  it?

13         MS. GLANDIAN:  Correct.  Yes.  Perfect.

14         MR. COROLLA:  Thanks for taking the time.  I do

15  appreciate it.

16         MS. GLANDIAN:  Thanks, Adam.  (Unintelligible.)

17         MR. COROLLA:  Mark -- Mark wants you to know you're

18  off the clock during this particular time.

19         MS. GLANDIAN:  Perfect.  That's going to happy

20  hour.

21         MR. COROLLA:  No billable hours here, Mark.

22              Thanks, Tina.

23         MS. GLANDIAN:  All right.  Thanks, Adam.

24         MR. COROLLA:  Appreciate it.



1             Wow.

2         MR. GERAGOS:  Yeah.

3         MR. COROLLA:  Interesting.

4                      (38:32 into the podcast was a

5                       commercial for True Car.)

6         MR. COROLLA:  All right.  So that was enlightening.

7    And, look, everyone who's listening --

8         MR. GERAGOS:  I'm really kind of -- I'm --

9         MR. COROLLA:  Yes.

10        MR. GERAGOS:  -- I'm really -- yes.  So go on,

11   Adam.  (Unintelligible.)

12        MR. COROLLA:  Well, here's what I want to say --

13   Here is what I want to say:  People have a notion and

14   they -- they think he's -- it's a hoax, it's not a hoax,

15   whatever their notion is.

16             I'm interested when I hear, like, Well, if a

17   guy -- if a couple of thugs attacked you in the street,

18   why would you, then, walk in the lobby of your building

19   eating a tuna fish sandwich?  And I go, Okay.  Yeah,

20   that -- that is something, why would do you that if you

21   were attacked in the street?

22             But if Gary told me to get him a tuna sandwich

23   from Subway and I was walking home and a couple guys

24   jumped on me and I dropped the bag, just like if I



1  dropped my phone or -- or my briefcase, backpack or

2  anything else, when I was done, I'd get up on my feet

3  and I collect all the stuff that I dropped or was in the

4  bag or was in the sort of debris circle, and I would

5  walk back in with it.

6         So I'm not here to say that means it didn't

7  happen, I'm just here to say that, Okay, we have an

8  explanation for the sandwich and with the text on the

9  down low.  We have one for that, too.  Sorry.  Go

10  ahead -- or on the low.

11  MR. GERAGOS:  I just going to say what really

12  bothers me about this case and the reason I think I said

13  three weeks ago that I was willing to wade into this and

14  take all of the bric-a-bracs is when people say I've

15  already made up my mind, I know what the evidence is,

16  and, you know, you're full of shit, what are you talking

17  about, blah-blah-blah -- not you, but me -- my question

18  is, How is it that you know this, number one, when they

19  haven't turned over or made public any of the

20  information?  All you know is what was said to you by --

21  in a press conference, and wasn't said to you, it was

22  done on the Thursday before a Tuesday mayoral election,

23  and you're the same person who would say, Why isn't

24  Chicago doing this?  You're the same person or the same



 1   mayor who sat on the Laquan McDonald videotape until a

 2   Federal Court ordered it to be turned over a year later

 3   so you know -- and there's demonstrable corruption in

 4   that department, and you're probably team anti-Chicago

 5   which is under a -- the Chicago Police Department, at

 6   least -- which is under a Federal Court consent order,

 7   where are you getting your information that you are so

 8   positive in your belief that what you think is true?

 9   That's what just drives in crazy.

10         MR. COROLLA:  Well, again, if you're turning on the

11   news, you turn it on the day after the attack, and this

12   guy was attacked in the streets by white supremacists

13   who were -- who are wearing MAGA hats, and then you turn

14   on the news one week later, and why would this guy have

15   the tuna fish sandwich in his hand, and, oh, by the way,

16   there's a text with him wanting to meet the -- the --

17   the assailant to have an on-the-low conversation with

18   him, and then you go -- you swing hard the other

19   direction and you go, Huh, now I know for sure this

20   story.

21         So I knew for sure the story the day after,

22   couple of white supremacists attacked a young gay black

23   man, and then a week after that, I knew the story for

24   sure, the black man put on a hoax in order to get



1    attention for himself in a higher -- and a pay raise

2    on -- on his television series.

3         MR. GERAGOS:  Right.  Right.

4         MR. COROLLA:  So that's how -- that's how we are.

5    You live somewhere in the middle, and most of us swing

6    hard this way, look at, every -- almost every single

7    person except for A.J. Benza, who announced he didn't

8    believe it the second it happened, every single person

9    in -- in America said, No.  This guy was attacked on the

10   street by a couple of racist thugs, and then one week

11   later, every single person in America said, This guy

12   staged a hoax.  So that's kind of who we --

13        MR. GERAGOS:  Yeah.  I mean, you don't

14   (unintelligible) --

15        MR. COROLLA:  -- it's who we are.

16        MR. GERAGOS:  And if you go back and listen, you

17   know, we were skeptical going in, you and I

18   collectively -- so if anybody wants to go back and look

19   at the record, we were skeptical going in, and skeptical

20   going out.

21        So I -- it's all -- it's kind of -- kind

22   of my -- the -- if we had Drew here, I think he would

23   tell you, it's the -- one of the things that you do

24   or -- you know, Drew will argue and -- and you probably



1  heard it, what, 5,000 times about the value of a liberal

2  arts education.  And one of the only things -- redeeming

3  thing -- that I can say about a liberal arts education

4  is to the degree that it teaches you to critically

5  think -- and, obviously, Adam you do that naturally --

6  but that is kind of what you would hope out of people is

7  just do some critical thinking.  And if you're sitting

8  and listening to Reasonable Doubt, then, you know, it's

9  the same thing where they critic- -- we're trying to

10  critically think as opposed to just accept what is spoon

11  fed to us.

12      MR. COROLLA:  Right.  By the same news networks

13  either -- whichever way the pendulum speaks, the same

14  group has swung, that -- the news world doesn't want to

15  live in the middle.  They're -- They don't -- There's no

16  such headline --

17      MR. GERAGOS:  No.

18      MR. COROLLA:  -- as, well, maybe, sort of, kind of,

19  probably, or sort of happened, it's just, This is what

20  happened over here, or -- and now, This is what happened

21  over there.  That's how they -- they make their money.

22  They don't have any 4s or 5s.  They're all 10s.  And

23  they're not all the -- going the same -- same direction.

24      MR. GERAGOS:  Right.



 1        MR. COROLLA:  On a -- On a -- Before we wrap it up,

 2   speaking of, like, Muller Report, where -- what's

 3   your -- what's your head on -- on that and what's moving

 4   forward and what should be done and where everyone's

 5   going with it?

 6                          (Approximately 45:50 in the podcast,

 7                           they start on a different subject

 8                           from the Smollett topic until the

 9                           end of the Reasonable Doubt podcast

10                           recording at 53:00.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24



```
 1    STATE OF ILLINOIS      )
                             ) SS.
 2    COUNTY OF COOK         )

 3

 4           The within and foregoing recorded audio

 5    excerpt was taken down stenographically and transcribed

 6    to the best of her ability by Traci L. Gidley, Certified

 7    Shorthand Reporter, Registered Professional Reporter,

 8    and Notary Public at the offices of Jensen Litigation

 9    Solutions, 180 North LaSalle Street, Suite 2800,

10    Chicago, Illinois, at 5:00 p.m. on June 8th, 2019.

11           Witness my official signature in and for Cook

12    County, Illinois, on this 20th day of June, A.D.,

13    2019.

14

15

16                         TRACI L. GIDLEY, CSR, RPR
                           180 North LaSalle Street
17                         Suite 2800
                           Chicago, Illinois 60601
18                         Phone:  (312) 236-6936

19

      CSR No. 084-004643
20

21

22

23

24
```



**1**

**1** 9:7 36:17
**10s** 42:22
**130** 6:7
**14** 12:9

**2**

**20** 23:4
**24** 15:16

**3**

**30-** 28:13
**38:32** 38:4

**4**

**4** 9:5
**4/6/19** 2:2
**45-second** 28:13
**45:50** 43:6
**4:56** 5:19
**4s** 42:22

**5**

**5** 5:21 36:1,4
**5,000** 42:1
**52/50** 12:9
**53:00** 43:10
**5s** 42:22

**7**

**7.5** 36:3

**8**

**8:00** 14:8

**9**

**9:00** 14:9

**A**

**A.J.** 41:7
**Abimbola** 13:20
**absolutely** 24:15
  33:7
**absurd** 24:1
**accept** 42:10
**access** 29:19
**accident** 32:16,24
**accidents** 32:19
**account** 25:10
**accused** 27:23
**act** 7:6
**actor** 29:19
**acts** 16:7
**actual** 17:1
**adage** 12:19
**Adam** 2:4,7 27:21
  37:16,23 38:11
  42:5
**adamant** 19:12
**add** 31:12
**advance** 30:20
**age** 3:8
**agree** 2:17 13:4
  33:6
**ahead** 5:17 31:18
  33:13 39:10
**air** 18:22 36:13
**Alicia** 34:3,9
**alive** 5:7
**America** 9:11
  41:9,11
**American** 9:12
**announced** 41:7

**ANNOUNCER** 2:3
**annuls** 7:2
**anti-chicago** 40:4
**anti-trump** 31:1
**anticipate** 10:20
**apartment** 17:11
**apply** 7:11
**approached** 28:8
**approaches**
  15:16
**approximately**
  43:6
**arbitrary** 6:12
**argue** 41:24
**arm** 11:9
**arts** 42:2,3
**assailant** 40:17
**asshole** 36:12
**associates** 2:21
**attack** 17:14,15
  21:4 22:18,23
  29:20 30:22 40:11
**attacked** 18:24
  30:18 31:5,10
  32:15 38:17,21
  40:12,22 41:9
**attacker** 28:7,10,
  20 31:22
**attempting** 7:13
**attention** 19:12
  41:1
**attorney** 2:24
  5:10,22 8:16 9:4
**attorneys** 6:20
**Australia** 16:19
**authority** 12:12,
  13
**awesome** 4:5

**B**

**bachelor** 27:7

**back** 6:11 9:1,14,
  15 11:21 14:2,5,14
  20:12 39:5 41:16,
  18
**backpack** 39:1
**bad** 7:21
**bag** 18:15 38:24
  39:4
**based** 30:15
**basically** 6:14
  12:18 14:18
**beaten** 20:11
**begging** 33:19
**beginning** 2:1
**begs** 18:8
**belief** 40:8
**believed** 35:12
**Benza** 41:7
**billable** 37:21
**billing** 11:1
**bills** 8:3
**black** 40:22,24
**blah-blah-blah**
  39:17
**bleach** 29:23
**blondish** 3:11
**bluff** 37:8
**Bon** 13:21
**bono** 11:3,8,12,13
**booker** 34:7
**bothers** 39:12
**bottle** 29:24
**bought** 16:4
**brain** 29:1
**brave** 9:5
**breaking** 3:15 6:6
**bric-a-bracs**
  39:14
**briefcase** 39:1

**broad** 13:6
**Brooklyn** 2:12
**brother** 13:10,11,
  13,15,16,19 23:9
  24:21 26:3,4,21,22
  27:13,19
**brothers** 18:23
  25:4 30:19,20
**building** 18:19
  19:3 38:18
**bullshit** 12:14
**bunch** 27:3
**buys** 15:23

**C**

**call** 3:3 14:18
  16:22 19:9,20 20:5
  29:2 32:1 33:24
  37:8
**calling** 2:9,10
  19:21 36:2,12
**calls** 15:19 16:23
  21:18
**camera** 29:1
**cap** 2:16
**car** 32:16,19 38:5
**case** 3:20 4:18
  6:21 7:1,12,23
  8:15 11:19 12:15
  13:22 21:8 22:6
  39:12
**cases** 4:13 7:8
**catch** 6:8
**cautious** 23:23
**celebrities** 4:1
**cellphone** 17:1,15
  20:13,18,21 21:24
**cellphones** 20:12,
  15,19
**challenge** 9:2
**challenges** 12:12
**character** 26:10



chase 18:1

check 9:17

Chicago 6:6 8:14
9:18 36:21 39:24
40:5

Chicago's 7:6

chief 7:23

circle 39:4

Circling 9:14

city 6:6 9:22 36:21

civil 37:5

claims 7:6

Class 9:5

clear 13:12 17:5

cleared 20:16

client 13:8

clock 37:18

close 14:17 19:16

closed 15:16

closer 17:5

Closeted 27:22

collect 39:3

collectively 41:18

comfortable
21:11

comment 30:5

comments 25:13

commercial 5:20
38:5

communicated
13:17

communication
13:23 20:23

compensated 7:1

completely 18:22
22:11 34:15 35:8

component 31:11

concept 13:6

concerned 12:6
17:23 19:18

conci- 18:22

concierges 18:19
19:2

conditioned 31:9

conference 39:21

confirm 19:2

conscious 30:23

consent 40:6

constant 13:23

construct 29:7

constructed 29:3

contact 21:12
28:14

context 20:8 22:8,
17 23:19 24:3,16

continue 11:1
16:14

controlled 21:15

conversation
14:23 22:23 31:3
40:17

Corolla 2:4,5,8,15,
17,24 3:4,10,12,
15,18,23 4:10,23
5:1,14,17,21 6:1,
22 7:13,18 9:14
10:10,13,17,19
11:6,15 12:23 13:3
16:2,11,14 18:17
19:24 20:3,7,11,15
21:20 23:6 24:4,19
26:8,16,18 27:2,
15,18,22,24 28:5
29:11,16 30:3,8,
10,14 31:13,16
32:6,8,10,13 33:4,
8,10 34:17,23
35:2,6,19,24
36:10,17 37:7,14,
17,21,24 38:3,6,9,
12 40:10 41:4,15
42:12,18 43:1

Correct 3:2 37:13

corroborate
20:19

corroborates
18:19

corroboration
9:7,8 22:6

corruption 40:3

couple 6:19 8:21
22:7 32:14 38:17,
23 40:22 41:10

court 2:12 3:7 7:2
40:2,6

crashing 27:11

crazies 4:21

crazy 30:1,2 40:9

creative 15:8,9,19

criminal 8:18 9:12

critic 12:8

critic- 42:9

critical 42:7

critically 42:4,10

critics 12:3

cut 5:8

**D**

day 5:6 9:7 10:21
14:6 40:11,21

days 12:9 22:18
25:23 30:16

deadline 6:11

debris 39:4

decides 15:17

declined 34:5,11

defensive 35:16,
17

defines 33:20

degree 42:4

delayed 14:10,16
15:12

demonstrable
40:3

demonstrably
8:15,24

demonstrative
7:15

dentist 5:4

department 40:4,
5

depend 37:2

depends 36:20

deposing 7:22

depositions 6:18

dick 36:2

diet 15:2

diminutive 9:17

direction 40:19
42:23

director 15:8,9,19

dirty 19:5

disagree 33:16

disclosed 7:8

discovery 8:12

discussing 3:20

dismiss 8:19
11:20

dismissed 8:17
9:16

distrusting 31:9

door 9:19

doubt 2:3,7,13 5:8
42:8 43:9

doubting 35:13

dozens 13:24

drank 27:8

Drew 41:22,24

drive-by 31:16

driver 33:1

drives 40:9

dropped 7:2
38:24 39:1,3

drunk 33:1

dudes 27:7

**E**

earlier 22:5

early 16:3 21:7
25:13

earpiece 17:2

ears 17:2

easier 10:8

eat 14:24 15:2,6,14

eating 38:19

eats 16:12

Eddie 6:19 18:20

education 42:2,3

eggs 15:3,6,14

eight-minute
22:22

elected 10:1

election 39:22

Emanuel 6:19
9:17

Empire 25:11
33:17,18

encounters 18:18

end 7:24 43:9

endeavor 36:1

ended 19:21 27:9

ends 14:9,10 19:8

enlightening 38:6

entire 21:10 36:1

entirety 17:15

episodes 8:22

ethically 9:1

evening 14:7

everyone's 43:4

evidence 11:18
39:15

examined 12:5

excess- 11:7

excessive 11:8



**exists** 29:18

**expand** 12:21

**experience** 36:8

**explain** 35:17

**explanation** 39:8

**express** 27:6

**extremely** 25:12

**eye** 3:13 7:14

---

**F**

**fabricated** 18:23

**face** 7:13 13:4 19:4 28:12,14,16

**face-to-face** 22:14 23:21

**fact** 2:13 22:24 25:9 29:6 34:2

**facts** 7:12

**faggot** 25:15

**fair** 31:24

**fallen** 18:14

**falls** 10:10,11 17:16

**false** 8:24

**fans** 4:4

**farther** 12:22

**fascinating** 30:12

**fast** 21:8

**fat** 23:12

**favorite** 2:14

**fears** 27:1

**fed** 42:11

**Federal** 2:11 40:2, 6

**feel** 5:7 11:17

**feeling** 37:7

**feet** 39:2

**fellas** 24:20

**felony** 9:5

**felt** 35:21

**field** 8:19

**fight** 32:16

**fighting** 17:18

**figure** 21:7 24:8

**file** 8:13,16 37:5

**finally** 36:22

**financial** 8:2

**find** 12:3 17:10 30:12 37:9

**finds** 18:8

**fine** 12:7

**finish** 26:20

**finished** 4:18

**firemen** 32:21

**fish** 38:19 40:15

**flick** 5:5

**flight** 15:12 32:17

**flight's** 14:10

**floor** 17:17,19 28:9

**flying** 14:5

**folks** 4:1

**followers** 8:10

**food** 15:11

**formulate** 30:14

**forward** 6:16 18:21,24 25:5,11 34:7 35:13 36:22 43:4

**found** 25:19

**frank** 15:19,20,21, 22,24 19:9,13,16, 21

**Friday** 2:13

**friendlier** 13:15

**friends** 25:15,21, 22 36:15

**friendship** 36:16

**frighten** 12:18

**full** 21:19 39:16

---

**G**

**Gary** 5:10,18 30:8, 9 31:6,8,13,17 36:3 38:22

**Gary's** 6:2

**gathers** 18:13

**gave** 28:19

**gay** 25:16 26:11 27:17,24 40:22

**general** 13:6

**generally** 19:11

**Geragos** 2:4,8,10, 16,22 3:2,6,11,14, 16,21,22 4:7,11,24 5:13,15 8:4 9:15 10:12,15,18 11:5, 7,11,13,16 26:14 27:21,23 32:12 35:5 36:7,15 38:2, 8,10 39:11 41:3, 13,16 42:17,24

**girl** 5:7

**gist** 2:18

**give** 16:21

**GLAAD** 31:1

**Glandian** 2:20 5:24 6:10 7:4,16 11:9,12 13:2,9 16:6,13,15 18:18 20:1,4,10,14,20 22:2 23:7 24:18,22 26:9,14,17,20 27:12,16,19 28:4,6 29:12,17 30:7,13 31:7,15,19 32:7,9 33:3,6,9,14 34:18 35:1,4,7,23 36:20 37:11,13,16,19,23

**GMA** 35:1,4,8

**God** 36:17

**gold** 7:24

**good** 6:1 7:21 12:24

**goodies** 37:10

**goodness** 32:18

**grab** 3:4

**grabbing** 18:15

**grabs** 18:14

**Grammys** 34:3,8

**grandstanding** 11:22

**grandstands** 12:16

**great** 4:4 24:23

**ground** 9:22

**group** 42:14

**growth** 24:13

**guess** 4:21 12:21

**guessing** 6:22 10:23

**guilty** 8:11

**guy** 9:16,20 27:24 38:17 40:12,14 41:9,11

**guys** 6:22 7:18 11:2 17:20 18:2 28:2,3,6 37:8 38:23

---

**H**

**hair** 3:11

**hand** 40:15

**handful** 13:14

**hanging** 25:20 26:11

**happen** 39:7

**happened** 7:2 13:7,9 17:6,24 19:18 25:5 28:22 29:4,7 32:11 33:17,23 34:4 41:8 42:19,20

**happening** 17:3 30:18

**happy** 6:17 37:19

**hard** 40:18 41:6

**hate** 31:4 36:9

**hated** 3:23

**hateful** 3:19

**hater** 36:8

**haters** 4:2,3 8:7

**hats** 40:13

**head** 36:2 43:3

**headed** 15:10,21

**heading** 10:13

**headline** 34:14 42:16

**heads** 15:23

**heal** 36:23

**hear** 5:23,24 6:20 13:8 21:23 24:9 31:13 35:14 38:16

**heard** 6:24 17:23 19:18 42:1

**hears** 17:12

**held** 20:9

**helps** 23:12

**herbal** 23:10

**Hey** 22:13 23:20

**high** 4:20

**higher** 41:1

**hired** 13:10,20 14:1

**history** 7:3

**hit** 4:13 27:24

**hits** 4:14

**hitting** 32:21

**hoax** 32:3,10 33:4 34:19,20 38:14 40:24 41:12

**hold** 5:18 12:9

**holding** 16:8

**Hollywood** 36:8

**home** 15:9,10 17:5 26:4 36:11 38:23

**homophobic**



25:6,9,12,17

honest 3:24

hooded 19:4

hope 42:6

hormone 24:13

horrible 10:20 24:7

hospital 20:2 32:20 34:1

hosts 2:4

hot 29:24

hour 2:7 37:20

hourly 10:23 11:1

hours 14:10 15:13,16 37:21

How's 8:3

human 24:13

hungry 15:12

hustling 17:17

hybrid 30:6

**I**

illegal 23:11

immediately 5:4

important 32:7

impression 29:6

in-depth 21:24

incident 16:8 21:17 25:24 28:13 29:4 33:23

include 16:10

including 15:3 19:17

inconsistent 34:15

independent 22:6 25:11

information 21:3, 12,14,19 27:3 39:20 40:7

initial 28:18 29:15

initially 21:9

inside 18:9,12,16

insist 6:16

intended 12:17

interacting 14:13

interest 26:7 27:20

interested 23:13 38:16

interesting 8:4 28:18,23 38:3

interim 16:17

interview 35:4

investigation 7:10

issue 8:20,22

**J**

John 5:20

Johnson 6:19 18:20

judgment 2:5

jump 32:8

jumped 19:7 38:24

jury 2:11

Jussie 2:24 10:17, 24 14:5 15:3 18:1 22:12 23:14 25:19 27:16 28:19 36:22 37:5

Jussie's 5:22 15:8 25:24 26:7

justice 9:13

**K**

Kaepernick 4:18 8:1

Keys 34:3

kicked 17:18 28:9

kind 3:7,11 4:9,20 5:3,5 7:6 12:2 15:2,12 17:8,17,23 19:13 22:14 26:21 27:9 28:8,24 31:24 32:1,4 34:4 35:10 38:8 41:12,21 42:6,18

kinds 5:2

knew 8:24 9:1,9 13:18,21 17:9 40:21,23

knocked 32:22

knowing 8:17

Korea 9:11

**L**

laid 27:8 30:20

landed 14:7,20

Laquan 40:1

large 6:7

late 14:21

law 8:18 11:24 12:21,22

lawsuit 37:5

lawyers 10:7

laying 17:16

leads 20:12

leaking 21:8

leaves 15:10 17:3

leaving 16:23 26:22

led 24:2

left 30:24

lets 14:19

letter 6:13 33:16 37:3

level 4:8,11

liberal 42:1,3

life 3:19 36:23

lines 5:11

listen 41:16

listening 24:6 38:7 42:8

litigation 37:1

live 41:5 42:15

lived 26:3

living 10:8

lobby 38:18

long 3:11

longer 9:24 14:20

looked 11:18

lot 19:15 20:7,24 25:20 34:15 36:14 37:10

lots 14:11 21:11

love 4:21 26:7 27:20 34:10

low 22:14 24:9,11 39:9,10

**M**

made 8:14 18:4 21:18 25:12 29:5 35:9 39:15,19

MAGA 40:13

make 10:8 11:19 13:11 14:24 15:5 22:8 24:5 26:23 29:8 35:22 42:21

makes 5:6 20:7 24:8 31:19

makeup 28:16 29:20 30:2

making 34:13

man 26:11 40:23, 24

manager 16:18,23 17:13,22 18:7 19:17

mandate 2:6

Mark 2:4,8,9 3:20 7:19 22:5 30:15 36:11 37:17,21

Mark's 11:9

mask 28:12 30:2

mayor 6:18 7:22 9:18 10:1 12:15 40:1

mayoral 39:22

Mcdonald 40:1

means 39:6

meet 14:15 22:13 23:20 40:16

meet-in-the-middle 30:6

meets 22:21

memory 28:22,23 29:2,3,7 32:1,17

mention 28:20

mentioned 28:16

message 22:12 34:9

messages 19:16 21:12 22:3,4,24 23:15 34:6

met 13:13

middle 17:8 41:5 42:15

midnight 14:17

midst 23:18

million 36:1,3

mind 9:19 12:2 25:4 26:5 31:20 32:14 39:15

mind's 3:12

miracle 6:3

mistake 32:1

mixed 10:6

Monday 2:11

money 7:21 10:5,7 30:21 42:21

month 35:24 36:4, 6,21

morning 12:24 14:21 15:15



**motivation** 24:19, 20,24 25:3

**motivations** 10:6 25:2

**motive** 26:15

**mouth** 13:8

**move** 36:22,23 37:3

**movement** 31:1

**moving** 6:16 28:15 43:3

**Muller** 43:2

**music** 13:22 16:18,23 17:13,22 19:17 23:4

**myth** 21:2

**N**

**narrative** 33:10,11 35:8

**naturally** 42:5

**nature** 14:4 21:18

**nearing** 17:11

**neck** 18:5

**needed** 35:22

**negative** 4:4

**nerve** 4:13,15

**networks** 42:12

**news** 6:6,9 40:11, 14 42:12,14

**NFL** 8:1

**Nigeria** 23:9,12,22 24:12 26:23

**night** 13:7,9 14:15 15:7 25:24 26:12 27:7

**noose** 18:5

**North** 9:11

**notion** 38:13,15

**nuanced** 12:5

**number** 13:16

29:21 39:18

**numbers** 7:20

**nutrition** 14:1,3 15:1 23:16

**O**

**Obvious** 32:14

**occasions** 13:14

**offered** 34:2

**office** 2:23

**Olab** 14:12

**older** 13:13,16 24:20 26:3,21 27:13

**on-the-low** 40:17

**openly** 26:11 27:17

**opportunity** 30:23 31:4

**opposed** 42:10

**order** 15:22 40:6, 24

**ordered** 40:2

**originally** 14:7

**outgoing** 9:18

**outrage** 7:14

**P**

**pad** 27:7

**paid** 30:20

**part** 7:6

**passing** 13:19 27:9

**past** 28:15

**path** 36:24

**pay** 41:1

**payday** 11:3

**paying** 10:24

**pays** 8:3

**pendulum** 42:13

**people** 5:2 8:5 9:20,21 12:3,18 13:4 14:13 16:7 17:9 19:16 24:6 25:11 32:18 33:17, 19,20 35:11 38:13 39:14 42:6

**perfect** 2:16 37:13,19

**persist** 36:24

**person** 5:3,5 8:10 19:11 31:21,22 39:23,24 41:7,8,11

**personal** 24:10,11

**phone** 2:17 13:16 16:24 17:21 18:14 19:19 21:1,4,10 39:1

**photographs** 21:11

**pick** 2:11

**picked** 11:2 15:7

**picks** 15:9 17:22

**pictures** 3:7

**piece** 6:8

**place** 15:8 17:10 18:8 26:1

**plaining** 14:3

**plan** 6:18 14:3 15:1 23:3,17

**plane** 15:13

**planned** 14:22

**plans** 22:23

**play** 29:3

**playing** 26:6,10 27:20

**plenty** 27:7

**pocket** 17:1,16

**podcast** 5:19 6:5 38:4 43:6,9

**point** 10:12 12:20 14:16 17:4,17,19 18:1 19:17 22:16

23:14 28:13 29:8 35:8 37:4

**pol-** 11:16

**police** 7:22 8:14, 23 9:23,24 19:3, 10,21,22 20:4,5,20 22:3,7,19 28:19 29:15 33:24 40:5

**politician** 3:23 11:20

**politics** 33:12

**pop** 5:10

**position** 25:7 35:17

**positive** 8:13 40:8

**possibility** 30:17

**pot** 7:23

**pounds** 23:4

**practiced** 8:18

**practicing** 11:23

**praise** 36:14

**Predictions** 35:24 36:19

**prepared** 2:11

**press** 29:3 39:21

**previous** 8:22

**principal** 11:14

**private** 19:11 34:22

**pro** 11:3,8,12,13 30:24

**problem** 3:9

**produce** 21:6

**proffer** 22:20

**pronounce** 37:11

**pronouncing** 2:20

**props** 29:21

**prosecutor** 8:19 11:17 22:19

**proud** 19:22

**proven** 12:15

**provide** 21:10,14

**provided** 20:24 21:1,3,19

**psycho** 12:10

**public** 6:20 7:14 21:7 33:15,22 35:14 39:19

**public's** 7:14

**publicity** 32:5 35:20

**publicize** 34:21

**punch** 28:14

**punched** 19:1

**pushed** 35:13

**put** 4:9 5:18 20:8 23:23 25:5 29:18, 24 30:1 35:16 40:24

**putting** 6:4 28:17

**Q**

**question** 7:19 9:14 24:23 39:17

**questions** 10:20 20:17

**quickly** 23:12

**quiet** 33:19 34:1

**quote/unquote** 22:1

**R**

**racist** 41:10

**Rahm** 6:18 9:17

**rainbow** 7:24

**raise** 41:1

**ran** 9:22

**randomly** 17:8

**rate** 10:23,24 11:1

**re-compensated** 7:1



re-elected 9:23

reaction 35:10

read 4:4 21:22 23:15,19

reading 36:11

ready 34:11

real 9:2 29:19

realize 18:4

realizes 17:21 18:3

realtime 19:15

reason 34:20 35:7 39:12

Reasonable 2:3, 7,13 42:8 43:9

reasons 6:14 37:4

reconstruct 32:24

reconstructing 33:2

reconstruction 33:5

record 41:19

recording 2:2 21:23 43:10

records 20:13,18, 21,22 21:1,4 22:1

redacted 21:1,2, 17

redeeming 42:2

reference 28:20

referred 13:21

referring 23:1

regimented 15:2

regularly 22:15

reimbursement 6:7

relationship 13:12 26:5,24 27:10

released 8:12

relevant 21:6

relied 22:11

relying 7:5

remember 32:19, 20 35:2

remembered 29:12

report 19:3 20:4 43:2

reports 28:18,19 29:15

research 7:4,7

responded 6:13

response 6:10

responsive 19:8

revealed 25:8

ridden 4:20

ridiculous 16:7 29:21

righted 11:6

rile 4:21

road 35:21

Roberts 34:24 35:5

Robin 34:23 35:5

role 26:6

ropes 29:23

rummaging 37:9

run 15:4 17:20

running 18:2

runs 2:22

---

**S**

sake 31:2

salad 15:24 16:12

sand- 16:11

sandwich 15:21 16:1,4,5,8 20:8,9 24:5 38:19,22 39:8 40:15

sat 34:23 35:2 40:1

sauce 29:24

save 7:13

scratches 19:4

screwy 2:18

sealed 8:13

self-inflicted 18:21

send 24:7

sending 14:11

sense 20:7 24:5 29:8 31:19

series 41:2

set 3:18

setting 6:14 21:15

seven- 22:22

shady 32:17

shed 23:3,12

shifted 35:9

shirtless 23:5

shit 39:16

shooting 31:16

shortly 3:3 25:8

shoulder 32:21

show 13:24 25:14 26:6

showboat 9:18 10:3

showboats 11:20

side 31:4,5,10,17

sidewalk 17:16

significant 29:14

silly 13:14

single 41:6,8,11

sit 3:24

sits 17:21

sitting 7:22 14:9 15:13 42:7

skeptical 41:17,

19

ski 28:12 30:2

skin 36:10

Smollett 3:20 10:24 43:8

Smollett's 2:24

Smollettland 3:17

socialize 25:23

sofa 27:9,11

solace 12:3

somebody's 11:22

sort 11:2 28:20 32:13,15 39:4 42:18,19

sounds 35:16

Soviet 9:12

speak 34:5,20

speaking 27:13 43:2

speaks 42:13

specific 26:17

speeding 33:1

spend 27:7

spending 30:11

spent 25:24 26:12

spinning 32:14

spoon 42:10

stage 34:3

staged 41:12

stairwell 17:7

stance 25:17

stand 11:22 12:20

stand-in 26:6

standard 10:24

stands 11:17

start 37:8 43:7

started 23:2 26:4 30:14

starts 26:12

state 6:4 31:20 32:22

State's 8:16 9:4 12:12

statement 25:5 35:22

statements 29:5

statute 7:5,6 12:17

staying 15:8

stays 17:15

steroids 23:10,22

stood 8:17

stop 16:2

store 15:23

story 34:13 35:13 40:20,21,23

street 17:8 20:11 38:17,21 41:10

streets 40:12

strokes 13:7

strong 25:17

strongly 11:17 25:6

studio 33:18

stuff 20:19 39:3

subconsciously 31:3

subject 36:18 43:7

subpoenaed 20:22

subscribe 31:6

Subway 15:18,20 16:12,24 17:3 38:23

suing 8:1

suits 33:11

summoned 30:20

sunset 4:20



**superintendent** 8:14,23 9:23,24

**supposed** 9:2 14:6,7,15 15:1

**supremacists** 40:12,22

**surprising** 25:14

**sweatshirt** 19:5

**swing** 40:18 41:5

**swung** 42:14

**system** 9:13

---

**T**

**table** 3:18

**takes** 6:18 15:9

**taking** 25:16 37:14

**talk** 3:15 21:1 22:13,14 23:21 24:10 34:4

**talking** 4:17 7:20, 21 13:3 17:13 23:2,16 24:3 25:19 30:15 33:21 34:13 39:16

**tarmac** 14:11

**teaches** 42:4

**team** 40:4

**technological** 6:3

**technology** 21:21

**teenage** 5:7

**telephone** 17:1

**television** 41:2

**telling** 35:17

**tells** 14:24 15:22 18:2,8,9,11 19:6

**ten** 25:23

**test** 26:21

**testing** 26:22

**text** 19:15 21:12, 23 22:3,4,12,16,24 23:15,23 24:2 34:6,9 39:8 40:16

**texted** 22:12

**texting** 16:17 19:19 23:15

**texts** 13:24 14:11 16:20 21:18 23:18

**theory** 13:3,5 22:19 26:2,15,17 27:3 30:3,6,14 34:16

**thick** 36:10

**thin** 18:22

**thing** 5:16 8:5,7 11:18 26:10 27:9 33:14 35:21 36:21 42:3,9

**things** 4:13 8:24 14:4 19:1 21:8 22:7 25:17 30:18 32:15 41:23 42:2

**thinking** 26:12 31:21 34:10 42:7

**thinks** 16:19 30:10

**thought** 12:4 15:16 16:18 21:5 23:24 27:14 29:10 31:10 35:9

**threat** 12:10

**throw** 26:15

**throwing** 7:20

**thrown** 18:5

**thugs** 38:17 41:10

**Thursday** 39:22

**til** 21:4

**time** 6:24 11:8 12:8 16:18,20 17:14 18:4 20:9 21:5 30:11 37:14, 18

**times** 5:6 42:1

**Tina** 2:20 5:10,14, 21,23 6:9 11:11,13 12:23 16:3 26:14 30:12,15 31:18 32:6 37:11,22

**Tina's** 5:21

**told** 4:16 23:7 38:22

**Tommy** 5:20

**tomorrow** 14:24

**tongue** 5:6

**tonight** 14:20

**toothache** 5:3,5

**topic** 43:8

**totally** 6:12 7:10, 11 31:6

**tough** 20:17 30:4

**train** 13:22 14:6,8, 20

**trainer** 14:24 24:11,12 25:22

**training** 14:1,3

**transcript** 21:22

**true** 32:2 38:5 40:8

**trunk** 37:9

**truth** 6:20 35:18

**Tuesday** 39:22

**tuna** 15:21,24 16:4,5 38:19,22 40:15

**turn** 21:13 40:11, 13

**turned** 31:3 39:19 40:2

**turning** 20:13 40:10

**turns** 15:17 17:13

**TV** 8:14

**Tweets** 3:19 4:4 24:7 25:9 36:2,11

**twist** 11:9

**Twitter** 10:21 25:10

---

**U**

**Uh-huh** 23:6 26:8

**unbridled** 12:12

**unconscious** 32:1

**unconstitutional** 7:12

**understand** 8:8

**understanding** 28:24

**understands** 26:24

**unhinged** 12:7

**UNIDENTIFIED** 2:3

**unintelligible** 2:12,14 4:24 7:9 9:21 10:14 18:15 20:4,6 21:20 25:1 27:20 36:16 37:16 38:11 41:14

**Union** 9:12

**universe** 2:7

**Unlike** 27:21

**unprecedented** 6:23 7:10

**upcoming** 13:22

**upside** 8:1,2

**upstairs** 19:6,8

---

**V**

**version** 24:9

**versus** 20:9

**victim** 35:12

**video** 13:22 23:4 29:1

**videotape** 40:1

**view** 12:5

**vitral** 12:1

**vitriol** 4:9 8:10

---

**W**

**wade** 39:13

**waiting** 5:15

**waking** 32:20

**Walgreen's** 15:11

**Walgreens** 15:15

**walk** 10:2 16:9 38:18 39:5

**walking** 38:23

**walks** 15:15 19:3

**wanted** 23:21 33:15 34:21

**wanting** 40:16

**water** 15:24

**ways** 10:8

**weapons** 18:10

**wearing** 40:13

**week** 2:16 3:16 4:5,16 6:11,13 12:24 33:17 36:4,5 40:14,23 41:10

**weeks** 39:13

**wet** 19:5

**whateversphere** 24:14

**whatnot** 15:3

**whichever** 42:13

**white** 13:4 28:2,3, 6,16,21 31:22 40:12,22

**Whoa** 24:10

**wondering** 26:4

**word** 25:15

**work** 6:2

**working** 8:3 22:16

**workout** 14:22 23:3,17

**workouts** 14:4

**works** 28:23

**world** 42:14

**wounds** 18:21

**Wow** 26:14 38:1

**wrap** 43:1



**wrapped**  4:18

**write**  9:17

**wrong**  8:15 11:6

---

### Y

**year**  40:2

**years**  25:10

**yelling**  17:12

**York**  2:10,22 14:6

**young**  3:9 10:7
  40:22

**younger**  13:14,19
  26:4,22

