## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| **Olabinjo Osundairo and Abimbola Osundairo, Individually** | |
| Plaintiffs, | Case No. 19-cv-02727 |
| v. | Judge Mary M. Rowland |
| **Mark Geragos, Tina Glandian, and Geragos & Geragos Law Firm,** | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Olabinjo Osundairo and Abimbola Osundairo (the "Osundairos")

filed suit against Mark Geragos, Tina Glandian, and Geragos & Geragos Law Firm

("Defendants") on claims of defamation and false light under Illinois law. Before

this Court is Defendants' motion to dismiss under Federal Rules of Civil Procedure

12(b)(2) and 12(b)(6) and special motion to strike pursuant to California Code of

Civil Procedure § 425.16. (Dkt. 23), in addition to Defendants' motion for sanctions

under Rule 11 (Dkt. 27). For the following reasons, Defendants' 12(b)(2) motion is

denied, Defendants' 12(b)(6) motion is granted in part and denied in part,

Defendants' motion to strike is denied in part, and Defendants' motion for sanctions

is denied.

## FACTS

The following facts are taken from Plaintiffs' Complaint. On January 29,

2019, Chicago-based actor Justin "Jussie" Smollet reported to the Chicago Police

Department ("CPD") that two men wearing ski masks attacked him in Chicago's Streeterville neighborhood while he was walking home. (Dkt. 1 at 2-3.) Smollet told police that the two men pulled a noose around his neck, poured an unknown liquid on his body, and assaulted him while yelling, "This is MAGA[1] country!" in addition to various racist and homophobic slurs. (*Id.*) On February 15, 2019, as part of the CPD's investigation into the incident, the Osundairos were taken into custody and questioned. (*Id.*) The Osundairos told police that the attack was a hoax entirely conceived and directed by Smollet. (*Id.* at 3-4.) On January 25, 2019, Smollet had approached the Osundairos, who were extras on Smollet's television show *Empire*, and asked them to help him stage an attack so that his employer and the public would notice and appreciate his success as an openly gay Black actor. (*Id.* at 4.) The Osundairos agreed and carried out the "attack" per Smollet's exact instructions. (*Id.*)

On February 20, 2019, the Osundairos testified before a grand jury regarding the true story of the January 29 attack. (Dkt. 1 at 4.) On March 7, 2019, the State of Illinois indicted Smollet with 16 felony counts of a false reporting. (*Id.*) Defendants, Tina Glandian, Mark Geragos, and their firm, Geragos & Geragos Law Firm, represented Smollet on his criminal charges. (*Id.* at 1-2; 4.) On or around March 26, 2019, the state's attorney's office dropped Smollet's charges. (*Id.* at 5.)

On or around March 27, 2019, Defendant Glandian appeared on the television show *Good Morning America* and on or around March 28, 2019, she

---

[1] MAGA refers to President Donald Trump's campaign slogan, "Make America Great Again." (Dkt. 1 at 3.)

appeared on the *Today* show to discuss the case. (Dkt. 1 at 5.) During both appearances she maintained that Smollet was innocent and that the Osundairos criminally attacked him. (*Id.* at 6.) She further stated that the Osundairos may have been wearing "whiteface" when they attacked Smollet. (*Id.*)

On or around April 6, 2019, Defendants Glandian and Geragos discussed Smollet's criminal case on a podcast, *Reasonable Doubt*. (Dkt. 1 at 8; 13). At this time, Glandian stated that the Osundairos were involved in illegal Nigerian steroid trafficking and intimated that Plaintiff Abimbola Osundairo engaged in homosexual acts with Smollet. (*Id.* at 9.) Geragos accused the Osundairos of conspiring to criminally attack Smollet. (*Id.* at 13.)

On April 23, 2019, the Osundairos filed the current suit alleging defamation *per se* and false light based on Glandian's and Geragos' statements during their various media appearances.

## LEGAL STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) tests whether a federal court has personal jurisdiction over a defendant. When deciding a Rule 12(b)(2) motion Plaintiffs have the burden of making a *prima facie* showing of personal jurisdiction. *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). In assessing whether Plaintiffs have met their burden, this Court may consider affidavits and exhibits from both parties.[2] *Id.* All well-pleaded facts alleged in the complaint and any unrefuted facts in Defendants' affidavits and

---

[2] In the present case, Defendant Geragos submitted a declaration contesting personal jurisdiction which this Court will consider. (Dkt. 31 Ex. F.)

exhibits are taken as true with any factual disputes resolved in Plaintiffs' favor. *Id.* at 783.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (internal quotations and citation omitted). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014).

## ANALYSIS

### I.  Personal Jurisdiction Over Geragos

Defendants assert that this Court lacks personal jurisdiction over Defendant Mark Geragos. A federal court with diversity jurisdiction "must apply the personal jurisdiction rules of the state in which it sits." *Kipp v. Ski Enter. Corp. of Wisconsin, Inc.*, 783 F.3d 695, 697 (7th Cir. 2015). Under the Illinois long-arm statute, Illinois courts may exercise personal jurisdiction over a nonresident defendant for the commission of certain enumerated acts and "on any other basis" that is "permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(a); (c).

Relying on the enumerated list in 735 ILCS 5/2-209(a), the Osundairos advance two theories in support of this Court's specific personal jurisdiction[3] over Geragos. First, they argue that Geragos' legal representation of Smollet constituted "[t]he transaction of business" in Illinois under 735 ILC 5/2-209(a)(1) and "[t]he making or performance of any contract or promise substantially connected to" Illinois under 735 5/2-209(a)(7). Second, they argue that Geragos' statements on his podcast *Reasonable Doubt* constituted "a tortious act" committed in Illinois under 735 ILCS 5/2-209(2).

When determining whether a party has transacted business in Illinois for the purposes of the long-arm statute, courts consider "'who initiated the transaction, where the contract was entered into, and where the performance was to take place.'" *Vilchis v. Miami Univ. of Ohio*, 99 F. App'x 743, 745 (7th Cir. 2004) (citing *Ideal Ins. Agency, Inc. v. Shipyard Marine, Inc.*, 572 N.E.2d 353, 357 (Ill. App. Ct. 1991)). Illinois courts look to the same factors when determining whether a party has made or performed a contract in Illinois. *See e.g., Viktron Ltd. P'ship v. Program Data Inc.,* 759 N.E.2d 186, 193-96 (Ill. App. Ct. 2001) (adding a fourth factor—"where the contract was negotiated").

In the instant case, the record does not indicate which party initiated the legal representation, where that agreement was signed or entered, or where it was

---

[3] Personal jurisdiction can be general or specific. General personal jurisdiction arises out of a defendant's "continuous and systematic" contacts with the forum state, subjecting him to jurisdiction in any action. *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010). An exercise of specific jurisdiction, however, is based on the defendant's contacts with the forum state that directly relate to the conduct at issue. *Id.* at 702. Geragos lacks "continuous and systematic" contacts with the State of Illinois. (Dkt. 31 Ex. F.) Plaintiffs do not argue otherwise. Thus, the Court only considers whether it has specific personal jurisdiction over Geragos.

negotiated. The only conclusion this Court can reach is that performance was to take place in Illinois where Smollet was facing criminal charges. Based on the limited information, the Court concludes that Geragos' legal representation of Smollet likely constitutes transacting business or performing a contract under Illinois law.

In the alternative, this Court turns to an analysis of whether Geragos' legal representation of Smollet subjects him to personal jurisdiction under federal law. While both the state and federal constitutional requirements must be satisfied, the Seventh Circuit has been "unable to discern an operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction," such that, the inquiry is often collapsed into an analysis of federal due process. *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 756-57 (7th Cir. 2010) (internal quotations omitted); *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019).

Under federal law, "[s]pecific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo*, 601 F.3d at 702 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "The exercise of specific personal jurisdiction must also comport with traditional notions of fair play and substantial justice as required by the Fourteenth Amendment's Due Process Clause." *Id.* (citing *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)).

On the first prong, the Seventh Circuit's holding in *Klump v. Duffus*, 71 F.3d 1368 (7th Cir. 1995) is instructive. In *Klump*, an Illinois resident sued a North Carolina-based attorney for malpractice in a lawsuit regarding a car accident in Illinois. The Seventh Circuit found personal jurisdiction over the out-of-state attorney because in "handl[ing] an Illinois lawsuit involving an automobile accident that occurred between two Illinois residents within the boundaries of Illinois," he had "personally availed himself of the privilege of conducting business in Illinois." *Id.* at 1372-73. The Court found compelling that the out-of-state attorney frequently contacted his client in Illinois during his representation and that the attorney "was aware that the case would exclusively involve Illinois parties, Illinois law, and would take place in Illinois." *Id.* at 1372.

Geragos too personally availed himself of the privilege of conduct business in Illinois. He was retained to handle a lawsuit arising out of conduct that occurred in Illinois between Illinois residents, to be prosecuted under Illinois law. Geragos also filed an appearance with the Circuit Court of Cook County, subjecting himself to the authority of the Illinois courts[4] and in anticipation of appearing in court, although the case was dismissed prior to his actual appearance. (Dkt. 31 Ex. F.) Plaintiffs have set forth enough evidence to establish a *prima facie* case that Geragos personally availed himself of the privilege of conducting business in Illinois.

---

[4] This Court's conclusion is supported by Illinois Rule of Professional Conduct 8.5 which provides that "A lawyer not admitted in this jurisdiction is also subject to the disciplinary authority of this jurisdiction if the lawyer provides or offers to provide any legal services in this jurisdiction." By filling an appearance in Illinois state court, Geragos subjected himself to the disciplinary authority of Illinois courts.

But the inquiry does not end there. The Court must also determine whether Plaintiffs' allegations arise out of Geragos' legal representation of Smollet. The Osundairos bring defamation and false light claims alleging that Geragos falsely accused them of conspiring to criminally attack Smollet. (Dkt. 1 at 13.) First, Geragos' role as Smollet's counsel bears on the plausibility of these claims. Plaintiffs can plausibly assert that Geragos knowingly lied because as counsel he would have likely known whether the Osundairos actually attacked Smollet or whether it was all a hoax. Second, Geragos' role as Smollet's counsel bears on Plaintiffs' claims that Geragos' statements caused them reputational and other damage. (*See id.* at 13-14.) Geragos' alleged accusation is injurious to the Osundairos' reputations because of Geragos' intimate involvement in the case as Smollet's counsel. Anyone else making the same statements would have simply been expressing a lay opinion. But Geragos' statement is laden with his credibility as a key player in the case. Thus, Plaintiffs' claims against Geragos arise from Geragos' contacts with Illinois as Smollet's legal counsel.

Finally, this Court finds that the exercise of personal jurisdiction over Geragos would not offend traditional notions of fair play and substantial justice. Where "plaintiff has made a threshold showing of minimal contacts, that showing is generally defeated only where the defendant presents a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Curry v. Revolution Labs.*, LLC, 949 F.2d 385, 402 (7th Cir. Feb. 10, 2020) (citing *Burger King*, 471 U.S. at 477). Defendants make no such argument. Moreover,

relevant factors such as the "'forum State's interest in adjudicating the dispute'" and "'the interstate judicial system's interest in obtaining the most efficient resolution of controversies'" support the exercise of personal jurisdiction in this case. *Id.* at 396 (citing *Int'l Shoe*, 326 U.S. at 316). Illinois has in interest in providing a forum for its residents to seek redress for tort injuries suffered within the state and inflicted by an out-of-state actor. Furthermore, because the causes of action in this matter are based on Illinois law[5], Illinois has a strong interest in having its own law interpreted and applied by a court sitting within its own state boundaries. A federal court sitting in Illinois is more likely to be familiar with Illinois law than courts in other jurisdictions and is thus, more likely to validly and justly apply it. For similar reasons, the fact that a federal court sitting in Illinois routinely interprets and applies Illinois law makes it better equipped to efficiently promote a just outcome than federal courts in other jurisdictions. Therefore, this Court finds that it may exercise personal jurisdiction over Geragos.[6]

## II.    Plaintiffs' Defamation and False Light Claims

To state a claim for defamation under Illinois law, a plaintiff must allege "facts showing that defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009). A statement is defamatory *per se* if its harm "is obvious and apparent on its

---

[5] The parties agree that Illinois law applies to the underlying defamation and false light claims.
[6] Because this Court finds that it has personal jurisdiction over Geragos arising out of his legal representation of Smollet, it declines to consider whether his podcast statements also serve as a basis for personal jurisdiction.

face," such that damages are assumed. *Id.* In Illinois, five categories of statements are considered defamatory *per se*, three of which are pertinent in this case: (1) "words that impute a person has committed a crime"; (2) "words that impute a person is unable to perform or lacks integrity in performing her or his employment duties"; (3) "words that impute a person has engaged in adultery or fornication." *Id.* Although a plaintiff is not required to lay out the allegedly defamatory statements verbatim, their substance must be pled "with sufficient precision and particularity so as to permit initial judicial review of [their] defamatory context" and "so that the defendant may properly formulate an answer and identify any potential defenses." *Id.*

A statement is not defamatory *per se*, however, if it is "reasonably capable of an innocent construction." *Lott v. Levitt*, 556 F.3d 564, 568 (7th Cir. 2009) (interpreting Illinois law). The innocent-construction rule "requires a court to consider the statement in context and to give the words of the statement, and any implications arising from them, their natural and obvious meaning." *Solaia Tech., LLC v. Specialty Pub. Co.*, 852 N.E.2d 825, 839 (Ill. 2006). "[I]f, as so construed, the statement may reasonably be innocently interpreted…it cannot be actionable *per se*." *Id.* (internal quotations and citation omitted). But, "if the likely intended meaning of a statement is defamatory, a court should not dismiss the plaintiff's claim under the innocent construction rule." *Tuite v. Corbitt*, 866 N.E.2d 114, 127 (Ill. 2006).

To state a claim for false light under Illinois law, the Osundairos must allege that (1) they were "placed in a false light before the public as a result of the [D]efendants' actions, (2) that false light "would be highly offensive to a reasonable person," and (3) the Defendants "acted with actual malice." *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 209 (Ill. 1992). Where an "unsuccessful defamation *per se* claim is the basis of his false-light claim, plaintiff's false-light invasion of privacy claim fails as well." *Seith v. Chicago Sun-Times, Inc.*, 861 N.E.2d 1117, 1130 (Ill. App. Ct. 2007).

### a. Media Transcripts

As a threshold matter, Defendants assert that Plaintiffs misrepresented the content of Glandian and Geragos' statements in their Complaint and attach transcripts of the *Good Morning America* and *Today* shows and the *Reasonable Doubt* podcast in support of this contention. (Dkt. 31 Ex. A-C.) While courts normally do not consider such extrinsic evidence without converting a motion to dismiss into one for summary judgment, where a document is referenced in the complaint and central to plaintiff's claims, the Court may consider it in ruling on the motion to dismiss. *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) ("This rule is a liberal one—especially where…the plaintiff does not contest the validity or authenticity of the extraneous materials."). This standard is met in the present case where Plaintiffs explicitly refer to these media appearances in their Complaint and the very statements at issue were made by Defendants during these media appearances. Plaintiffs do not object to the Court's consideration of

these transcripts and do not dispute their validity or authenticity—in fact Plaintiffs' reference the transcripts in support of their own arguments (*see for example*, Dkt. 37 at 8-9) and admit that "Defendants themselves could and did isolate the exact transcripts of the specific conversations to which the complaint referred". (*Id.* at 5.) The Court will thus consider these media transcripts in ruling on the sufficiency of Plaintiffs' Complaint.

### b. Glandian's Statements

<u>Statement that Plaintiffs Criminally Battered Smollet</u>

In paragraph 26 of their Complaint, the Osundairos allege that during her appearances on *Good Morning America* and *Today* Glandian falsely stated "that Plaintiffs criminally attacked Mr. Smollet." (Dkt. 1 at 6.) Plaintiffs assert that this statement is defamatory *per se* because it expressly accuses the Osundairos of criminal battery.

This allegation is far too broad. It does not resemble any specific statement made by Glandian during either show. Plaintiffs do not identify any particular statement that forms the basis for this allegation. The allegation seems to summarize the overall message communicated by Glandian's interviews, and thus, could refer to several or even *all* of Glandian's statements. This imprecision leaves Defendants and this Court guessing as to which statements are at issue. Plaintiffs' claims of defamation *per se* and false light based on the allegations in paragraph 26 are thus dismissed for lack of specificity. *See Green*, 917 N.E.2d at 460; 462 (dismissing defamation *per se* allegations that did "not set forth precise and

particular statements so much as plaintiff's summaries of the types of statements defendant presumably made.")

"Whiteface Statement"

In paragraph 27 of their Complaint, the Osundairos further allege that Glandian "falsely submitted that Plaintiffs may have been wearing 'whiteface' while attacking Mr. Smollet—again stating Plaintiffs battered Mr. Smollet and adding the implication that this battery was a hate crime." (Dkt. 1 at 6.) Unlike the general allegation in the preceding paragraph, this allegation fairly points to a specific portion of Glandian's *Today* interview:

Ms. Guthrie: But the Osundairo brothers, what are the chances that that's the case, that he saw someone with light skin?

Ms. Glandian: Well, you know, I mean, I think there's—obviously, you can disguise that. You could put makeup on. There is, actually, interestingly enough, a video…It took me all of five minutes to Google—you know, I was looking up the brothers, and one of the first videos that showed up, actually, was one of the brothers in white face doing a Joker monologue with white makeup on. And so it's not—it's not implausible.

(Dkt. 31 Ex. B at 12.) Plaintiffs argue that this statement is defamatory *per se* because it accuses the Osundairos of committing battery/hate crime and implies that the Osundairos perjured themselves during grand jury proceedings and lied to the police. Defendants argue that the statement does not expressly accuse Plaintiffs of committing a crime and is subject to an innocent construction.

The Court finds that this statement could fairly impute the crimes of battery and hate crime to the Osundairos. Although Glandian did not specifically say the words "battery" or "attack," considering the context of the statement, it is certainly plausible that Glandian is directly accusing the Osundairos of attacking Smollet. Glandian is asked to explain how it is possible that the Osundairos were Smollet's attackers if Smollet stated his attackers were white. In this context, a plausible interpretation of Glandian's "whiteface comment" is that she was attempting to dispel the inconsistency in Smollet's story (the attackers had light skin) and bolster her contention that the Osundairos (who are not light skinned) were in fact Smollet's attackers. This statement, read in context, maintains that the Osundairos attacked Smollet and adds the implication that the attack was a hate crime.

For the same reasons, Defendants' argument that the statement is nonactionable because it has a reasonable innocent construction fails. The "likely intended meaning" of this statement is that the Osundairos did in fact attack Smollet and may have been wearing whiteface while doing so, not simply—as Defendants advance—"that one of the Plaintiffs wore whiteface in a video in which he played the Joker." (Dkt. 31 at 18.) Plaintiffs' claim of defamation *per se* based on paragraph 27 survives.

This statement, however, does not impute the crimes of perjury or false reporting to law enforcement. The imputation of a crime must be apparent from the face of the statement. *Green*, 917 N.E.2d at 459. Glandian does not accuse the Osundairos of lying let alone lying to a grand jury or the police. Furthermore, the

statement was not made in the context of a discussion of the Osundairos' grand jury testimony or statements to police. Any claims of defamation *per se* premised on imputing perjury and false reporting based on the "whiteface statement" are dismissed. These portions of paragraph 31 and 32 of Plaintiffs' Complaint are stricken. (Dkt. 1 at 6-7.)

<u>Accusation of Perjury & Providing False Information</u>

Plaintiffs allege that Glandian "specifically stated" that the Osundairos perjured themselves during grand jury proceedings and gave false statements to the police. (Dkt.1 at 6-7; *see also* Dkt. 1 at 8; 11.) Glandian did not "specifically state" as such, but the allegations seem to correspond to the following statement Glandian made on *Good Morning America*:

> Mr. Stephanopoulos: —if the brothers [the Osundairos] are saying that he [Smollet] helped them stage this attack, you're saying the brothers are lying?
>
> Ms. Glandian: Absolutely.
>
> Mr. Stephanopoulos: They're not telling the truth?
>
> Mr. Glandian: No.

(Dkt. 31 Ex. A at 6.)

These statements cannot be defamatory *per se* on the basis that they impute the crimes of perjury or providing false statements to law enforcement. To be actionable as defamation *per se* the statement must directly or expressly accuse the plaintiff of committing a *specific* crime—not of lying generally. *See Black v. Wrigley*, No. 17 C 101, 2017 WL 8186996, at *9 (N.D. Ill. Dec. 8, 2017) (finding statement

that plaintiff lied to a judge insufficient to support a claim of defamation *per se* because it did not directly or expressly accuse the plaintiff of perjury); *Kapotas v. Better Gov't Ass'n,* 30 N.E.3d 572, 590 (Ill. App. Ct. 2015) ("[T]he use of a term which has a broader, noncriminal meaning does not impute the commission of a crime."). Glandian's statement does not specifically say that the Osundairos lied to a grand jury or the police and was not made in the context of a discussion of the Osundairos' testimony at grand jury proceedings or their statements to police. Thus, Plaintiffs' claims of defamation *per se* and false light based on perjury and making false statements to the CPD are dismissed.

Illegal Steroids Statement

Plaintiffs allege in paragraph 46 of their Complaint that during her appearance on *Reasonable Doubt*, "Glandian falsely stated that Plaintiffs are involved in "'illegal' Nigerian steroid trafficking" as part of their fitness training business "Team Abel[7]." (Dkt. 1 at 8.) They further allege in paragraph 47 that Glandian stated verbatim that Plaintiffs' fitness "platform…is all about being steroid-free…Their whole thing is, you know, all-natural bodybuilding. It's ridiculous." (*Id.*)

Beginning with the second statement (the "Ridiculous Statement"), as evidenced by the podcast transcript, Glandian did not make this statement on *Reasonable Doubt*. Instead, this statement was made by the Osundairos' former

---

[7] "Abel" refers to Abimbola Osundairo.

counsel. (*See* Dkt. 31 Ex. E. at 8.)[8] Plaintiffs fail to address this discrepancy in their opposition brief. The Ridiculous Statement cannot form the basis of any defamation claim against Glandian and Paragraph 47 is stricken from Plaintiffs' Complaint.

As to the allegation of illegal steroid trafficking, Glandian stated:

Abel had told him [Smollet] that—you know, because they were about to— him and his brother were about to go to Nigeria. He said there's these herbal steroids you can take that really—that are illegal here in the US but that I can get in Nigeria, and it helps you shed fat very quickly. So if you are interested, let me know.

(Dkt. 31 Ex. C at 23.) Plaintiffs argue that this statement is defamatory *per se* because it imputes the crime of drug trafficking. Defendants counter that the statement falls short of a direct accusation of drug trafficking and merely states that Abimbola Osundairo *could* get illegal steroids—not that he did in fact procure illegal steroids.

This Court agrees that Glandian's statement does not "clearly and definitively refer to a specific offense that is indictable" and upholds Defendants' reasonable innocent construction of the statement. *Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 947 (Ill. App. Ct. 1997) (statement that plaintiff had "past offenses in other places along with cars, something to do with car theft" does not impute the commission of a crime because it "does not state that plaintiff had

---

[8] Defendants' Exhibit E is a Chicago Tribune article that contains the statement at issue. This Court takes judicial notice of this article and considers it in ruling on this motion. *See Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1064 (N.D. Ill. 2004) (noting that "it is routine for courts to take judicial notice of both newspaper articles and court records.").

committed car theft; but rather that he had committed past unspecified offenses that had something to do with car theft."). Merely knowing where or how to procure illegal steroids is not drug trafficking, and thus, cannot be actionable as defamation *per* se. Plaintiffs validly assert that a statement that someone knows how to procure illegal steroids *can* imply that he has previously procured illegal steroids and can do so presently, but when considering defamation per se "any reasonable, innocent interpretation sounds the death knell to a *per se* defamation claim." *Lott,* 556 F.3d at 569. Considering the context, Glandian made the steroid comment, not to implicate Abimbola Osundairo in drug trafficking activity, but to explain a text message between Smollet and Osundairo. (*See* Dkt. 31 Ex. C at 22-23.) This statement cannot form the basis of a defamation *per se* claim.

Plaintiffs also argue that Glandian's statement is defamatory *per se* because it imputes a lack of professional integrity in the operation of the Osundairos' fitness business which is premised on maintaining an "all-natural," "steroid-free diet and fitness regimen." (Dkt. 1 at 8-9.) But, as Defendants argue, the all-natural, steroid-free aspect of Plaintiffs' business is an extrinsic fact—there is no mention of this during the *Reasonable Doubt* podcast. Where extrinsic evidence is needed to explain why a statement is damaging, it cannot be defamatory *per se. Dubinsky v. United Airlines Master Exec. Council*, 708 N.E.2d 441, 447 (Ill. App. Ct. 1999). Plaintiffs' claims of defamation *per se* and false light based on Glandian's steroid comment are dismissed.

Homosexual Activity Statements

Finally, the Osundairos allege that during *Reasonable Doubt*, "Glandian inferred that [Abimb]ola Osundairo and Mr. Smollet engaged... in homosexual acts together." (Dkt. 1 at 9.) During the podcast, Glandian stated that ten days before Smollet's attack, Abimbola Osundairo spent the night at Smollet's house and this caused Olabinjo Osundairo to wonder whether the two had a relationship. (Dkt. 31 Ex. C at 25-26.) When specifically asked, "Was there a relationship or was it crashing on the sofa?", Glandian stated, "No. But I'm saying—What I'm speaking to is what the older brother would have thought...because he knows that Jussie is openly gay." (*Id.* at 27.) Plaintiffs argue that these statements are defamatory *per se* because they falsely accuse Abimbola Osundairo of fornication.

This Court agrees with Defendants that these statements can reasonably be innocently construed.[9] The transcript reveals that Glandian expressly stated that she was only speaking as to what Olabinjo Osundairo might have thought of Abimbola spending the night at Smollet's—not about what Abimbola and Smollet actually did. Thus, Plaintiffs' claims of defamation *per se* and false light based on these statements are dismissed.

**c. Geragos' Statements**

The Osundairos allege that on his podcast *Reasonable Doubt*, "Geragos falsely stated that he could not think of anyone else who committed the hate crime against his client, Mr. Smollet, besides Plaintiffs" and further that "Plaintiffs

---

[9] Defendants also argue that these and certain other statements are not defamatory *per se* on grounds that they are nonactionable expressions of opinion as opposed to fact. The Court declines to consider this argument.

conspired to criminally attack Mr. Smollet…impl[ying] [that] Plaintiffs committed perjury before the February 20, 2019 grand jury and conspired to make false statements to Chicago Police." (Dkt. 1 at 13.) Plaintiffs do not cite to any verbatim quotes from the podcast; instead the Complaint only purports to paraphrase Geragos' statements. (*Id.*) Defendants move to dismiss all claims against Geragos on the basis that Geragos did not make any of the alleged statements during the *Reasonable Doubt* podcast. Plaintiffs fail to rebut this argument.

After reviewing the podcast transcript, this Court agrees with Defendants. Geragos did not make any statements during the podcast that could reasonably be interpreted as being implicated by the allegations in Plaintiffs' complaint. Plaintiffs fail to allege with adequate particularity the statements that form the basis for their defamation and false light claims against Geragos.[10] Counts III and IV are therefore dismissed.

**d. Actual Malice**

Defendants move to dismiss all of Plaintiffs' false light claims on the basis that Plaintiffs have failed to adequately allege actual malice. Because Defendants' other statements do not support claims for defamation *per se*, and consequently, false light, the only statement the Court considers is Glandian's "whiteface statement". Actual malice means "'that the defendants made ... the false statements with knowledge of their falsity or in reckless disregard for their truth or falsity.'"

---

[10] Indeed, while Defendants were able to identify several of the Glandian statements to which Plaintiffs refer in their Complaint, Defendants were unable to do so in the case of Geragos. (*See* Dkt. 31 at 6.)

*Raveling v. HarperCollins Publishers Inc.*, No. 04-2963, 2005 WL 900232, at *4 (7th Cir. Mar. 4, 2005) (citing *Kolegas*, 607 N.E.2d at 209-10.) Although malice may be alleged generally, "the bare conclusory claim of malice, unaccompanied by allegations from which the required subjective element of malice might be inferred, is insufficient to survive a motion to dismiss." *Pippen v. NBC Universal Media, LLC*, No. 11-CV-8834, 2012 WL 12903167, at *2 (N.D. Ill. Aug. 2, 2012), *aff'd sub nom. Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610 (7th Cir. 2013) (internal quotations and citation omitted).

Here, the Osundairos allege generally that Glandian "acted with actual malice and reckless disregard for the truth, knowing these statements were clearly false." (Dkt. 1 at 12.) The Complaint also alleges that Glandian was Smollet's attorney. (*Id.* at 4.) Drawing all inferences in favor of the Plaintiffs, it is plausible that Glandian knew the "whiteface statement" was false because she was Smollet's attorney. Thus, Plaintiffs' allegations sufficiently show actual malice and Plaintiffs' claims of defamation *per se* and false light based on the "whiteface statement" survive.

## III.    Plaintiffs' *Respondeat Superior* Claim

In Count V of their Complaint, the Osundairos bring a claim of *respondeat superior* against Defendant Geragos & Geragos Law Firm. (Dkt. 1 at 15.) Defendants move to dismiss this count on the basis that *respondeat superior* is a theory of liability, not an independent cause of action. Defendants are correct— "*respondeat superior* is not by itself a cause of action" under Illinois law. *Jones v.*

*UPS Ground Freight, Inc.*, No. 15 C 7991, 2016 WL 826403, at *3 (N.D. Ill. Mar. 3, 2016) (citing *Wilson v. Edward Hosp.*, 981 N.E.2d 971, 980 (Ill. 2012). Accordingly, Count V of the Osundairos' Complaint is dismissed with prejudice.

## IV.     Defendants' Special Motion to Strike Under California Law

Defendants move to strike the entirety of Plaintiffs' Complaint pursuant to California Code of Civil Procedure § 425.16 which protects against strategic lawsuits against public participation ("SLAPP"). This Court only considers the applicability of this defense to Glandian's "whiteface statement", since it has dismissed the remainder of Plaintiffs' claims for failure to state a claim of relief.

Plaintiffs argue that because Illinois law applies to the underlying defamation and false light claims California's anti-SLAPP statute does not apply. Defendants submit that this Court may properly apply California law under the doctrine of dépeçage. Courts may invoke dépeçage when "it is appropriate to apply the law of more than one jurisdiction," because "the issues to which the different laws are applied are separable." *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 848 (7th Cir. 1999). In the "case of an anti-SLAPP statute raised as a defense to a defamation claim, the choice-of-law question regarding the anti-SLAPP law is treated separately from 'whether a statement is defamatory'" because "the anti-SLAPP question involves whether a statement is privileged, not whether its content is defamatory." *Underground Sols., Inc. v. Palermo*, 41 F. Supp. 3d 720, 722 (N.D. Ill. 2014) (citing *Chi v. Loyola Univ. Med. Ctr.*, 787 F.Supp.2d 797, 803 (N.D. Ill.

2011). Thus, the fact that Illinois law governs the defamation and false light claims at issue does not preclude the application of a different state's anti-SLAPP law.

Plaintiffs argue further that it is more appropriate to apply Illinois law, rather than California law, to any anti-SLAPP defense Defendants raise because Illinois has the "most significant contacts" with the dispute given that the defamatory harm occurred in Illinois. But while the place of injury is critical in determining the law applicable to a defamation claim, this factor is "less important" to the choice-of-law question for an anti-SLAPP defense. *Chi*, 787 F.Supp.2d at 803. Rather the central considerations are where the allegedly defamatory speech occurred and the domicile of the speaker. *Id.*; *Underground Sols.*, 41 F.Supp. 3d at 723-24; *Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1035 (N.D. Ill. 2013), *aff'd*, 791 F.3d 729 (7th Cir. 2015). Although Glandian made the whiteface statements in New York[11], her affidavit clearly establishes that she is domiciled in California. While she currently spends more time in New York, she was born and raised in California, maintains a residence and owns property in California, has a California driver's license, and is registered to vote in California. (Dkt. 31 Ex. G.) Thus, it is appropriate to apply California's anti-SLAPP statute in this case. *See Glob. Relief v. New York Times Co.*, No. 01 C 8821, 2002 WL 31045394, at *11 (N.D. Ill. Sept. 11, 2002) (applying Illinois law to defamation claim but California law to anti-SLAPP defense because "California has a great interest in determining how much protection to give California speakers.").

---

[11] The Court takes judicial notice of the fact that the *Today* show is filmed in New York.

A defendant filing a special motion to strike under California's anti-SLAPP statute must make a threshold showing "that the suit arises out of the exercise of [her] right of petition or free speech." *Id.*; Cal. Civ. Proc. Code § 425.16(b)(1). The anti-SLAPP statute enumerates certain categories of "act[s] in furtherance of a person's right of petition or free speech," including "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." Cal. Code Civ. Pro. § 425.16(e). If the court finds that the defendant has made such a showing, the burden shifts to the plaintiff to "demonstrate through the pleadings and affidavits that there is a probability he will prevail on the claim." *Glob. Relief*, 2002 WL 31045394, at *11. But this standard is slightly different when applied by a federal court sitting in diversity. To avoid a conflict between California's anti-SLAPP law and the Federal Rules of Civil Procedure, the Ninth Circuit has held that "when a[] [California] anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018).

Defendants argue that Plaintiffs' claims of defamation and false light arise out of statements they made in a public forum in connection with an issue of public interest. California courts have considered "statements concerning a person or entity in the public eye" a matter of public interest. *Hilton v. Hallmark Cards*, 599 F.3d 894, 906-07 (9th Cir. 2010) (applying California's anti-SLAPP law and

concluding that statements about Paris Hilton were a matter of public interest). Thus, because Glandian's statement concerned Smollet, a celebrity who had received extensive media coverage regarding the very content of the statement, and because the *Today* show is a public forum, Glandian's "whiteface statement" reasonably falls within the scope of the anti-SLAPP statute's protection. Nevertheless, because Defendants' arguments for dismissal of Plaintiffs' claims are based on legal insufficiency (*see* Dkt. 31 at 26-27), Plaintiffs' are only required to show that the "whiteface statement" makes out a legally sufficient claim for defamation *per se* and false light, which as discussed above, it does. Defendants' motion to strike pursuant to California's anti-SLAPP statute is thus denied as to the "whiteface statement."

## V.  Rule 11 Sanctions

Defendants' Motion for sanctions under Federal Rule of Civil Procedure 11 asserts that Plaintiffs (1) had no basis to assert the Ridiculous Statement was defamatory because Plaintiffs' own lawyer made the statement, not defendants; (2) had no evidence of Geragos engaging in any defamatory conduct but sued him because of his fame; and (3) had no legal basis to assert *respondeat superior* as a cause of action but did so only to name Geragos' law firm, Geragos & Geragos, as a Defendant in the case. Plaintiffs have not responded to the Motion. The Court, as an exercise of its discretion, declines to impose Rule 11 sanctions.

It is well-settled that the decision to imposed Rule 11 "sanctions is left to the discretion of the trial court in light of the available evidence" *Divane v. Krull Elec.*

*Co., Inc.,* 200 F.3d 1020, 1025; 1028 (7th Cir.1999). Furthermore, to justify the imposition of sanctions, the movant must satisfy the "high burden of showing that Rule 11 sanctions are warranted." *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 860 (N.D. Ill. 2015); *see also Bilharz v. First Interstate Bank of Wis.,* 98 F.3d 985, 989 (7th Cir.1996) (affirming summary judgment but reversing Rule 11 sanctions because "although [plaintiff's] arguments were undoubtedly weak, we cannot say that [plaintiff's] claims were so devoid of factual support that sanctions were appropriate"). This Court does not believe the allegations here were so devoid of factual support so as to warrant Rule 11 sanctions.

## CONCLUSION

For the foregoing reasons, Defendants' 12(b)(2) motion for lack of personal jurisdiction is denied, Defendants' 12(b)(6) motion is granted in part and denied in part, and Defendant's special motion to strike based on California Code of Civil Procedure § 425.16 is denied in part. Defendants' motion for sanctions is denied.

E N T E R:

Dated: March 17, 2020

_____
MARY M. ROWLAND
United States District Judge